## Case No. 3,646.
### DAVIS et al. v. PENDERGAST et al.
[8 Ben. 84.] [1]

District Court, S. D. New York. April, 1875. [2]

DEMURRAGE—DEFAULT OF CHARTERERS—RUNNING DAYS—CUSTOM OF PORT—LIGHTERS—AGENT.

1. The owners of the bark M. and L. chartered her to P. & Co. for a voyage from New York to Rio. The charter provided that there should be allowed "lay days as follows, that is to say, forty-five running days for loading and discharging," and that, "in case the vessel is longer detained," the charterers should pay demurrage at the rate of £9 for every day so detained. "providing such detention shall happen by default" of the charterers or their agent. The owners claimed to recover thirteen days' demurrage. The evidence showed that thirty-two of the forty-five lay days were consumed in loading in New York; that the vessel arrived at Rio on the 19th of December, 1866, and the agents of the charterers were notified on December 24th that the vessel was ready to discharge, and the cargo was finally all taken out on the 19th of January; that the cargo could be discharged either at a dock or by lighters, and the master, fearing he would have to take his turn at a dock, discharged all the cargo, except some coal, by lighters; that he applied to the charterers' agent to furnish lighters and he did so, the ship paying for the use of them, but there was delay in their being furnished; and that the coal was discharged at a dock and the discharge occupied seven days, but could have been made in one, if the charterers had furnished means to take away the coal, as they should have done. Held, that the burden of proof was on the owners to show that the vessel was detained by default of the charterers.

[Cited in McLeod v. Sixteen Hundred Tons of Nitrate of Soda, 55 Fed. 532.]

2. The mere lapse of time was not necessarily a default.

[Cited in McLeod v. Sixteen Hundred Tons of Nitrate of Soda, 55 Fed. 532.]

3. No default was shown in the thirty-two days consumed in loading in New York.

4. The charterers, as to the forty-five running days, took the risk of holidays, Sundays, and other non-working days.

5. The charterers were not responsible for the delay in furnishing the lighters.

[Cited in McLeod v. Sixteen Hundred Tons of Nitrate of Soda, 55 Fed. 532.]

6. As no default of the charterers was shown in respect to the thirty-two days consumed in loading, and none in respect to the cargo discharged in lighters. and, as there were thirteen running days left to the credit of the charterers at Rio it was of no consequence if they were in default as respecting the discharge of the coal. The libel must be dismissed.

[Libel for demurrage by William R. Davis and others against Charles H. Pendergast and others.]

Beebe, Donohue & Cooke, for libellants.
John N. Whiting, for respondents.

BLATCHFORD, District Judge. This is an action to recover for thirteen days' demurrage, at nine pounds sterling per day, on a

[1] [Reported by Robert D. Benedict. Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]
[2] [Reversed in Case No. 3,647.]

charter party made at New York, September 19th, 1866, between the libellants, owners of the bark Mary and Louisa, by their agents, and the respondents, by which that vessel was chartered to the respondents for a voyage from New York to Rio de Janeiro in Brazil. The charter party provides that there shall be allowed for the loading and discharging of the vessel, at New York and Rio de Janeiro, "lay days as follows: that is to say, forty-five running days for loading and discharging," and that, "in case the vessel is longer detained," the respondents shall pay "demurrage at the rate of nine pounds sterling per day, day by day, for every day so detained, provided such detention shall happen by default" of the respondents or their agent.

The libel, after averring the execution of the charter party and setting forth a copy of it as a part of the libel, states that it was agreed thereby that the respondents should have forty-five running lay days for loading and unloading, and that, if the vessel should be longer delayed, the respondents would pay to the libellants nine pounds sterling per day, day by day, so long as she should be so detained. This averment wholly ignores the clause in the charter party which provides that the respondents are not to pay demurrage for the detention of the vessel beyond the forty-five running days, unless such detention happens by the default of the respondents or their agent. The libel also avers, that the respondents, after being notified of the readiness of the vessel to receive cargo at New York, used in loading her thirty-two of the lay days provided for in the charter party; and that, after the agents of the respondents at Rio de Janeiro were duly notified that the bark was there and ready to discharge her cargo, it could easily have been discharged within six days, but the vessel was detained by such agents, in the discharge of her cargo, for the thirteen days after the expiration of the forty-five lay days.

There can be no doubt that, under this charter party, the burden of proof is on the libellants to show that the vessel was detained by the default of the respondents. The express contract was, in effect, that the respondents should be liable only for such detention of the vessel, after the forty-five running days were exhausted, as should happen by their default or that of their agent. The mere lapse of time was not necessarily a default. It was for the libellants to show such default affirmatively. Towle v. Kettell, 5 Cush. 18, 23.

Although the libel avers that the respondents consumed, in loading the vessel at New York, thirty-two of the lay days provided for in the charter party, yet it does not aver that such thirty-two days were improperly or unnecessarily so consumed, nor does it aver that there was any detention of the vessel by the respondents, within the meaning of the charter party, in loading her, or any default on the part of the respondents in taking thir-

ty-two of the lay days to load the vessel. Nor is there any evidence that there was any such detention or default in loading the vessel. The allegation of the libel and the evidence are directed wholly to the point, that the detention and the default were in the discharging of the cargo at Rio de Janeiro.

The libel avers that the bark arrived at Rio de Janeiro on the 19th of December, 1866; that the agents of the respondents there were notified on the 24th of December that the bark was ready to discharge cargo; that the cargo could easily have been discharged by the bark within six days; but that she was thereafter detained by the agents of the respondents, in the discharge of the cargo, until and including the 19th of January, 1867, when the unloading was completed. If these averments be regarded as equivalent to an averment that the vessel was in fact ready to discharge on the 24th of December, the libellants have failed to show that she was ready to discharge by that day, and they have also failed to show satisfactorily when afterwards she was ready to discharge, so as to set running the thirteen lay days that were left. She was not at any wharf by the 24th of December, nor did she have by that day any lighter alongside, into which she could discharge. The notice of her readiness to discharge amounted to nothing unless she was in fact ready to discharge. The master of the bark, who is a witness for the libellants, testifies, that the vessel arrived at Rio de Janeiro on the 19th of December; that he reported to the agents of the respondents there on the 24th of December, as being ready to discharge; that the first cargo was taken out two or three days after that, and he cannot say positively what day; that the cargo was finally discharged on the 19th of January; that all of the cargo was discharged into lighters while the vessel was at anchor, except the coal, which was discharged at a wharf; that the delay was caused by the lighters not coming fast enough; and that, if the lighters had come fast enough, he could have discharged the whole cargo easily in six days. He also testifies, that he applied to the agents of the respondents to furnish the vessel with lighters; that he applied to no one else for a lighter; that the vessel paid for the use of the lighters; and that he remonstrated with the agents repeatedly about the insufficient number of lighters. The master appears, on his own evidence, to have chosen the method of discharging by lighters, and to have employed what he considered proper measures to procure them, and, although he thought at the time that the supply of lighters was not sufficient, he did not resort to any means to procure more lighters, or resort to any other means of discharging any of the cargo. He testifies that there was plenty of room in Rio to land coal and lumber; that there were other methods of discharging coal and lumber than in lighters; that coal and lumber were not custom house

goods and could have been discharged at other wharves than the custom house wharves; that the reason for his resorting to lighters was that he thought he could discharge the custom house goods sooner by lighters, than by waiting his turn for a custom house wharf, because there were a number of vessels ahead of his; and that he was informed that if he wanted to discharge otherwise than by lighters he would have to wait such turn. The charter party contains a clause that "the cargo shall be received and delivered alongside within reach of the vessel's tackles, or according to the customs of the port." The fact that the master employed the agents of the respondents to procure the lighters is of no consequence. The charter party provides that the vessel shall "be consigned to charterers' friends at port of discharge, subject to a commission of two and one-half per cent." The master says that the vessel paid for the use of the lighters. This made the agents of the respondents, pro hac vice and in reference to the furnishing of lighters, the agents of the vessel. As respects, therefore, all of the cargo that was discharged by lighters, which included all of the cargo except the coal, I do not see that the libellants have shown any detention of the vessel by the respondents.

As regards the coal, the master says he could have discharged it in one day, and that seven days were consumed in discharging it at the wharf, because the respondents failed to provide means for taking it away as they should have done. As no default by the respondents is shown in respect to the thirty-two days at New York, and none in respect to the cargo discharged at Rio by lighters, and as there were thirteen remaining days left to the credit of the respondents at Rio, it is of no consequence that they were in default in respect to the discharge of the coal at Rio, if that were the fact.

There is no doubt that the charterers, in respect to the forty-five running days, took the risk of holidays, Sundays, and other non-working days. The question is as to the days beyond the forty-five running days, and as to those the libellants must show a default by the respondents. The claim made by the libellants that the respondents bargained for only the forty-five running days, and that, if their cargo was not loaded and discharged absolutely in that time, they must pay demurrage for the additional time consumed, is inconsistent with the terms of the charter party. It is argued for the libellants, that mere lapse of time was default, and that, when the forty-five running days elapsed, the respondents then became in default, if the delay thereafter was not caused by the act of the libellants. This is to change the contract which the libellants made, and to throw off from themselves the burden which they thereby assumed. It is to give no meaning to the clause in regard to default.

It appears by the testimony that it is the custom of the port of Rio de Janeiro for the

vessel to pay for lighters and to pay all other expenses until the cargo is landed on the wharf. This fact alone would, under the provision in the charter party, that the cargo is to be "delivered alongside, within reach of the vessel's tackles or according to the customs of the port," throw on the vessel prima facie the responsibility for the delay caused by the want of a sufficient number of lighters. The duty of the respondents in respect to the cargo at Rio commenced only when it was placed on the wharf by the vessel. Until then they could be chargeable with no delay in respect to it, unless they delayed the lighters, after they were loaded, in discharging their loads. It is not pretended by the master in his testimony that more than three days of that description of delay occurred. This, with the delay in respect to the coal, would make up but nine days out of the thirteen running days left as lay days when the vessel arrived at Rio.

On the whole case the libellants have failed to make out any cause of action and the libel must be dismissed, with costs.

[NOTE. On an appeal by libellants to the circuit court, this judgment was reversed. Case No. 3,647.]