McLEOD v. 1,600 TONS OF NITRATE OF SODA.

(District Court, N. D. California. April 18, 1893.)

No. 10,253.

1. DEMURRAGE—EXCEPTIONS—POLITICAL OCCURRENCES—EVIDENCE.

Libelant's ship proceeded to a Chilian port for cargo under a charter party which provided for demurrage at a certain rate, "the act of God, political occurrences, fire, * * * excepted." Civil war was progressing in Chili. The port was blockaded by the de facto government, and the agent of the charterers was unable to procure cargo because the sellers would not deliver, for fear of being compelled to pay a second export duty in case the government fell. *Held,* there being no actual vis major encountered by the charterers, to prevent a loading, that they were not within the exceptions of the charter party, and were liable for demurrage.

2. SAME—ACTUAL PREVENTION OF LOADING.

The fact that the political occurrences in question indirectly prevented the charterers from procuring a cargo, or from bringing it to the port of loading, was not sufficient to exempt them from liability. They must have prevented the charterers, after procuring the cargo at the port of loading, from loading it on the vessel.

In Admiralty. Libel by George McLeod against 1,600 tons of nitrate of soda, (J. W. Grace & Co., claimants,) cargo of ship Dunstaffnage, for breach of charter party. Decree for libelant.

Andros & Frank, for libelant.

Page & Eells, for claimants.

MORROW, District Judge. The libelant, by his agents, Scammel Bros., of New York, chartered the British bark Dunstaffnage to J. W. Grace & Co., of San Francisco, by charter party dated September 16, 1890, for a voyage from a safe nitrate port, as ordered by

charterers or their agents, to San Francisco, Cal. The charter party contained the following stipulations:

"The said parties of the second part do engage to provide and furnish the said vessel, during the voyage aforesaid, with a full cargo of, say, nitrate of soda, in bags, to be received by the vessel as customary. * * * The said parties of the second part shall be allowed, for the loading and discharge of said vessel at the respective ports aforesaid, lay days, as follows: Thirty working lay days for loading, to commence 24 hours after her inward cargo and/or unnecessary ballast is finally discharged, and captain has given written notice to that effect. * * * And for each and every day's detention by default of said parties of the second part, or their agents, they agree to pay to the said party of the first part demurrage at the rate of four pence sterling per ton register per day; but, should the vessel be detained by the master beyond the time herein specified, demurrage shall be paid to charterers at the same rate, and in the same manner. * * * The cargo shall be received and delivered within reach of the vessel's tackle. * * * The act of God, enemies, political occurrences, fire, and accidents beyond charterers' control, as well as the dangers of the seas and navigation, always excepted."

It was also provided that the loading port should be named by the charterers at the last port at which the vessel should discharge lumber. The bark discharged its cargo of lumber at Antofogasta, in the republic of Chili; and the charterers, about December 4, 1890, named the port of Caleta Buena as the loading port, under the terms of the charter party. The Dunstaffnage arrived at the last-named port February 9, 1891, when the master of the vessel was notified by the agent of the charterers that the port was blockaded. The cargo intended to be shipped by the Dunstaffnage was purchased by J. W. Grace & Co., for such purpose, in time for shipment in accordance with the terms of the charter party. But, under the laws of the republic of Chili, then in force, there was payable by the sellers, on all cargoes of nitrate of soda sold for shipment from Chilian ports, an export duty of $1.50, Chilian money, for each 100 Spanish pounds. This duty was payable to the government of Chili, at its customhouse at the port of shipment. When the Dunstaffnage arrived at Caleta Buena, February 9, 1891, there was in progress, in the republic of Chili, a war between two parties, both of whom claimed to be the government of that country. One party was known as the "Congressional Party," of which George Montt, subsequently president of the republic, was one of the leaders; and the other, as the "Balmaceda Party," of which latter party, Balmaceda, then president of the republic, was the chief. The Congressional party, with its military and naval forces, held possession of the town and port of Caleta Buena, and so continued in possession during the period involved in this controversy; and during that time no representative of the Balmaceda party or government was at that port, to whom the duties could have been paid, but there was a representative of the Congressional party at the port, who was ready to receive such payment, and to issue thereupon a clearance to the vessel and cargo. The charterers failed to deliver a cargo on board the Dunstaffnage within the time required by the charter party; and they give as a reason for such failure the refusal of sellers of nitrate to deliver the same for shipment during such time as the Balmaceda party was

v.55f.no.4—34

unrepresented at Caleta Buena, on the ground that payment of the export duty to the Congressional party would not be in liquidation of such duty, and a defense to them, as against any claim which might thereafter be made therefor by the Balmaceda party, or a defense against any charge that might thereafter be made against them by the Balmaceda party for a violation of the revenue laws of the government. As a matter of fact, the Balmaceda party never regained possession of the town or port of Caleta Buena; but on the other hand, while the Congressional party claimed to be the true government of Chili, at no time during the detention of the Dunstaffnage at Caleta Buena was the independence of the government of the Congressional party recognized by any nation, and it was not until September 4, 1891, that this party became victorious, and possessed the entire country, and formed a provisional government, which was recognized by the United States and other nations September 7, 1891.

The blockade of the port of Caleta Buena was raised by the Congressional party February 15, 1891, and permission given to vessels lying in port to load saltpeter, upon condition that the duties had been previously paid to the commander of the gunboat stationed at that port. On March 16, 1891, the master of the Dunstaffnage notified the agent of the charterers that the lay days provided for in the charter party expired on that day. In reply to this notice, the agent refused to admit the claim, and referred to the exceptions contained in the last clause of the charter party, providing: "The act of God, enemies, political occurrences, fire, and accidents beyond charterers' control, as well as the dangers of the seas and navigation, always excepted." The vessel was loaded with a cargo of nitrate, and dispatched April 23, 1891; and it is agreed that the amount of demurrage incurred, if any, is $1,927.37.

The question is as to whether the charterers are relieved from liability for the detention of the vessel at Caleta Buena beyond the period of 30 days, under any of the conditions or exceptions provided by the charter party. The law is well established that where a contract specifies a certain number of days for the loading or unloading of a vessel, and provides that, for any detention beyond the lay days, demurrage is to be paid at a fixed rate per day, the shipper is held strictly to its terms. Randall v. Lynch, 2 Camp. 352; Leer v. Yates, 3 Taunt. 387; Barker v. Hodgson, 3 Maule & S. 267; Bessey v. Evans, 4 Camp. 131; Barret v. Dutton, Id. 333; Thiis v. Byers, 1 Q. B. Div. 244; Straker v. Kidd, 3 Q. B. Div. 224; Cross v. Beard, 26 N. Y. 85; Railroad Co. v. Northam, 2 Ben. 1; Sleeper v. Puig, 17 Blatchf. 36; Williams v. Theobald, 15 Fed. Rep. 469. But it is claimed by the charterers in this case that the delay in loading the vessel was not their default, but the interposition of a superior force, for which they were not liable, under the terms of the stipulation providing for demurrage "for each and every day's detention by default of the said parties of the second part." In support of this position the following cases are cited: Towle v. Kettell, 5 Cush. 18; The Cargo of the Mary E. Taber, 1 Ben. 105; Thacher v. Gaslight Co., 2 Low. 361.

In Towle v. Kettell the charterers agreed to pay demurrage for detention, provided such detention should happen by their default. The vessel was detained in quarantine, and the suit involved a claim for demurrage for such detention, but the court held that the detention was not the default of the charterer.

In the case of The Cargo of the Mary E. Taber, the stipulation was to the same effect,—that the charterers should pay demurrage for detention of the vessel, provided such detention should happen by their default. The cargo was wood. By the custom of the trade, the vessel was bound to deliver the cargo at different places in the port, if requested. The master, having delivered his deck load at one dock, was requested by the charterer to deliver the rest at another, and lost several days in getting there, by reason of the weather. The court held that no demurrage could be recovered, under the charter, for such detention.

In Thacher v. Gaslight Co. the stipulation was that the charterer would pay demurrage "for each and every day's detention by default" of the charterer. The cargo was coal. The vessel was detained, waiting for a berth where she could be conveniently discharged. The court, in its opinion, referred to the two cases just cited, and Davis v. Wallace, 3 Cliff. 123, (decided by Judge Clifford in 1863,) and said:

"These three decisions are not inconsistent with each other; and they mean that the proviso intends to exonerate the charterer from delay occasioned by superior force acting directly upon the discharge of that cargo, and not from the indirect action of such force, which, by its operation on other vessels, has caused a crowded state of the docks. If the respondents do not furnish the wharf room, or any other means and appliances which they are to supply, it is not enough for them to prove that they have taken reasonable measures to procure them. In short, the default does not mean negligence, but a failure of contract on their part, unless it is caused by a direct and immediate vis major, or something like it."

The law, as declared in this last case, certainly does not relieve the charterers from liability, upon the facts in the present case. No force was applied to prevent the delivery or loading of a cargo on board the Dunstaffnage at Caleta Buena. The most that can be said is that a third party, wishing to avoid the possible risk of being required to pay the export duties a second time, refused to deliver a cargo to the charterer in time to enable the latter to make the shipment in accordance with the terms of his agreement with the libelant. It was not a direct or immediate vis major, nor anything like it; but the voluntary act of the seller of the cargo, in refusing for a time to assume a risk which attached to the business, and rested upon one or both of the parties to that transaction. As between the owner of the vessel and the charterers, it was the duty of the latter to furnish a cargo within the time agreed upon, or be in default; and, being in default, it is not sufficient for them to plead now that they took reasonable measures to procure a cargo. This is the doctrine established by a number of the leading cases.

In Davis v. Pendergast, 16 Blatchf. 565, it was stipulated in the charter party that the charterers should have 45 running days for loading and discharging cargo, and in case the vessel was longer detained they were to pay demurrage, provided the detention should

happen by their default. The vessel was detained 13 days after the expiration of the 45 lay days; and the default involved, in part, the conduct of third parties, as appears by the following in the statement of the case:

"By the customhouse regulations, the assorted cargo could only be discharged at the customhouse, either from the vessel alongside, or by means of lighters. If lighters are employed, the expense is paid by the vessel. If the discharge is made at the customhouse, the vessel must wait her turn for a place alongside. All the cargo on the bark was discharged upon lighters, except the coal, which was delivered from the vessel at a wharf. The lighters were furnished by the consignees, and paid by the vessel. Seven days were occupied in discharging the coal, when it might have been put out in half that time. The reason for this delay was that the coal had been sold by the agents of the respondents, and was to be delivered at the rate of thirty tons per day. The lumber was delivered from the lighters to the different persons to whom it had been sold by the agents of the respondents. Much delay was caused by this mode of doing business, sometimes on account of the great distances the lighters were sent, and sometimes by the refusal of parties to take the lumber. There was no time when the persons receiving the cargo were delayed by the vessel. The lumber could have been put off in a little more than two days at the wharf, or upon lighters, if they had been ready to take it. The master of the vessel frequently called upon the consignees to furnish him with lighters more rapidly. The assorted goods were discharged by the lighters as soon as they could have been if the vessel had waited her turn at the customhouse."

In the district court the libel was dismissed; the court holding, upon the authority of Towle v. Kettell, that the burden of proof was on the owners to show that the vessel was detained by default of the charterers, that the mere lapse of time was not necessarily a default, and that the charterers were not responsible for the delay in furnishing the lighters. Davis v. Pendergast, 8 Ben. 84. Upon appeal to the circuit court, Chief Justice Waite, sitting as circuit justice, overruled this decision, holding, in favor of the libelants, that—

"The term 'running days' was evidently employed to exclude the idea of working days only. This throws upon the respondents (charterers) all the risks of detention by intervening Sundays and holidays, as well as by the ordinary interruptions incident to the business, such as customhouse and port regulations in reference to the manner of taking in or discharging cargo, lack of wharfage or lighterage facilities, not due to any fault of the vessel, and the like. The respondents, in effect, agreed that no more than forty-five running days should be occupied in loading and discharging the cargo, unless it was occasioned by some fault of the vessel, or some unusual and extraordinary interruption, that could not have been anticipated when the contract was made. Detention by reason of any of the risks assumed by the respondents placed them in 'default,' within the meaning of that term, as used in the charter, and rendered them liable for the stipulated demurrage."

Counsel for the respondents in the present case contends that the authority just cited is to be interpreted in their favor, because of the qualification that the charterers' liability is excused when the default is occasioned by "some unusual and extraordinary interruption, that could not have been anticipated when the contract was made." But an interruption was anticipated, as we shall see when we come to consider the exceptions provided in the charter party. For the present, we are only concerned in determining, in limine, what constitutes a "default" on the part of the charterers, without reference to other exceptions and conditions.

In Dow v. Hare, decided by Judge Hoffman, in this court, in 1876,

the charter party provided for the carriage of a cargo of coal from San Francisco to Ounalaska, to be there delivered to the United States steamer Saranac, which was expected to be in port at the time of the arrival of the chartered vessel. When the vessel arrived at Ounalaska the steamer Saranac was not in port, and the vessel lay through her lay days, and a number of days after, on demurrage. The Saranac had been wrecked and lost at sea. The chartered vessel discharged her cargo on the wharf, returned to San Francisco, and sued for demurrage. The demurrage clause in the charter party was the same as in the case at bar. It was contended on the part of the defense that the facts did not bring the case within the terms of the agreement, inasmuch as the failure to receive the cargo was not due to the "default of the charterers." The court held that it was the duty of the charterer to provide a consignee to receive the cargo at the place of destination, and, failing in this duty, he was "in default." The case was appealed to the circuit court, where the decree was affirmed. If we apply the law, as thus declared, to the present case, we must say that the charterers were in default when they failed to provide a cargo for the Dunstaffnage within the time stipulated in the contract, and that they were not relieved of their liability because their failure was primarily the result of a default of a third party. See Abb. Shipp. (13th Ed.) p. 268, and cases there cited.

We come now to the exceptions contained in the charter party, which, it is admitted, qualify the demurrage clause, and under which it is claimed that the charterers are relieved from liability because of "political occurrences" and "accidents beyond charterers' control." Assuming that these intervening causes did operate so as to prevent the sellers of nitrate from delivering a cargo to the charterers, the question arises as to whether they prevented the loading of the vessel, within the meaning of the exceptions. It is contended on the part of the libelant that it is not sufficient that these causes, if they existed, prevented the charterers from procuring a cargo, or from bringing it to the place or port of loading, but they must have prevented the charterers, after having had the cargo procured and ready at the port of loading, from doing the actual work of loading the cargo on board the vessel. In other words, they should have had the cargo bought and delivered to themselves at the usual place of loading, and then, if the political occurrences or accidents beyond charterers' control operated directly so as to prevent the loading of the vessel, the exceptions would be a defense, but if these causes simply prevented the charterers from securing the delivery of a cargo from the purchaser to them at the port of loading, and thus indirectly prevented them from loading the vessel, the exceptions are no defense, because the prevention is not only too remote, but not within the terms of the contract. The leading case in support of this construction is Grant v. Coverdale, (in the house of lords,) L. R. 9 App. Cas. 470. In that case the charter party contained a stipulation that the ship "shall, with all convenient speed, sail and proceed to Cardiff East Bute dock, or so near thereunto as she can safely get, and there load," etc. The demurrage clause was as follows:

"Time to commence from the vessel being ready to load, and ten days on demurrage over and above the said lay days, at forty pounds per day, except in case of hands striking work, or frosts, or floods, or any other unavoidable accidents preventing the loading."

The vessel proceeded to the Cardiff East Bute dock. The charterer did not have his cargo on the dock ready to load, but it was necessary for him to bring it from the West Bute dock, which was connected with the East Bute dock by a canal, and locks at both ends. During the lay days of the ship a frost set in, and the canal became impassable by ice, by reason of which the charterers were unable to bring the cargo alongside the ship, except, at extraordinary expense, by carting, which the referee found, though physically possible, was not a reasonable mode to adopt, under the circumstances. The court held that the frost did not prevent the loading, within the meaning of the exception, and in commenting on the scope of the exception the Earl of Selborne said:

"These words in the exception are as large as any words can be. They mention 'strikes, frosts, floods, and all other unavoidable accidents preventing the loading.' If, therefore, you are to carry back the loading to anything necessary to be done by the charterer in order to have the cargo ready to be loaded, no human being can tell where you are to stop. The bankruptcy, for instance, of the person with whom he has contracted for the supply of the iron; or disputes about the fulfillment of the contract; the refusal, at a critical point of time, to supply the iron; the neglect of the persons who ought to put it on board lighters to come down the canal for any distance, or to be brought by sea, or to put it on the railway, or bring it in any other way in which it is to be brought,—all those things are, of course, practical impediments to the charterer having the cargo ready to be shipped at the prope place and time. But is it reasonable that the shipowner should be held to be answerable for all those things, and is that within the natural meaning of the word 'loading?' Are those things any part of the operation of loading? Nothing, I suppose, is better established in law, with regard to mercantile cases of this kind, than the maxim, 'Cause proxima, non remota, spectatur;' and it appears to me that the fact that this particular wharf was very near the Cardiff East Bute dock can make no difference, in principle, if it was not the place of loading."

In the same case, Lord Fitz Gerald states his conclusion as follows:

"It seems to me that the exception applies only where the accident prevents the loading at the place of loading, and not where it prevents or retards the transit or conveyance of the cargo to the place of loading. The shipper was bound to have a full cargo at the place of loading, and he took on himself all the risks consequent upon delay in transit. If he had had it there, it could have been loaded within the lay days, and no case of demurrage could have arisen."

This case was cited as authority upon a like question by the circuit court of appeals for the fifth circuit in the case of The India, 49 Fed. Rep. 82; and the latter case was followed by the same court in Sorenson v. Keyser, 52 Fed. Rep. 163.

In the case of The Village Belle, 30 Law T. (N. S.) 232, the court appears to have given a somewhat wider range to the stipulated exceptions, but not to the extent of excusing the charterer for a delay caused by the happening of events not directed against the particular vessel. In that case the charterer was to furnish a cargo of iron ore at Bilboa, Spain. At the time of the arrival of the vessel at that port (February 23, 1873) the place was threatened by the

armed forces of the Carlist party. The excepted perils stipulated in the charter party, in favor of the charterer, were:

"All accidents and causes occurring, beyond the control of the shippers and of freighters, which may prevent or delay her loading or discharging, including civil commotions, strikes of any pitmen or workmen, riots, frosts, floods, stoppage of trains, accidents to machinery, &c., always excepted."

The ship was detained for 39 days after the expiration of the lay days, for which demurrage was claimed. The defense of the charterer was that the default in loading "during the lay days was excused by the happening of events excepted by the charter party in favor of the charterer. Sir Robert Phillimore held that the burden of proof was upon the charterer to show that the noncompliance with the terms of the charter party was occasioned by the happening of such events. The charterer accordingly produced evidence of great disturbances in the district from which the iron ore was being obtained; that the Carlists had cut the Deputation Railway, which brought ore down from the mines; and that the disturbed state of the country interfered with the hauling of the ore. The court held that the charterer could not excuse his default in loading within the lay days by giving evidence of general disturbance and cessation of work in the district about the time, but to exempt himself from liability he must show a disturbing cause actually preventing the loading of the particular ship.

In the case at bar the political occurrences and accidents beyond charterers' control had no direct relation to the loading of the chartered vessel; but, so far as they were unusual and intervening causes, they constituted a general condition of affairs, operating upon all vessels and all shippers alike. Such a condition, as we have seen, is not a sufficient excuse. The charterers should have provided a cargo at the place of loading within the time stipulated in the charter party; and if, in doing so, they, or those of whom they purchased, incurred any risk or peril, it was their misfortune, and not the fault of the owner of the vessel, who had performed his part of the contract.

It is, however, conceded, on behalf of the libelant, that the exceptions qualify other conditions of the charter party, and, among others, the stipulation that they should "provide and furnish" a cargo; and it is contended, on behalf of the charterers, that to provide a cargo for a vessel means to place it alongside for shipment. If it is not placed there, it cannot be loaded. If it is not loaded, it is because it is not provided. Consequently, the failure to load is a failure to provide, and vice versa, and a delay in doing the one act is a delay in doing the other. This argument assumes that political occurrences would not ordinarily operate upon the mere act of loading a vessel, but might interfere so as to prevent the charterer from having a cargo provided at the place of loading. This reason could be urged, however, with even greater force to enlarge the meaning of the words "frost," "flood," and "drought," making them qualify the antecedent stipulation, to provide and furnish a cargo; but in the cases cited these exceptions have been held to qualify only that part of the contract relating to the loading of the vessel; or if, by the terms of the stipulation, it is made ap-

plicable to the agreement to furnish a cargo, as in the case of The Village Belle, then it must appear that the intervening cause of delay was directed against the particular cargo. The real difficulty, however, with this argument, as applied to the present case, is that the charterers did not fail to provide and furnish a cargo. They performed that part of their contract, but not in time to avoid the penalty provided in another part of the contract,— for a delay in loading the vessel.

The conclusion is that it was the duty of the charterers to have a cargo at the place of loading, and that the exceptions in the charter party did not operate so as to excuse the charterers for the failure of a third party to supply them with a cargo for shipment within the period of lay days provided in their agreement. This determination renders it unnecessary to inquire as to what act or intervening cause would amount to a political occurrence, or an accident beyond the charterers' control. It is sufficient, for the present, to say that it is very doubtful whether the risk of being required to pay export duties a second time would come within the terms of either exception. A decree will be entered in favor of the libelant for $1,927.37 and costs.