# THE MAJESTIC.[1]

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND
CIRCUIT.

No. 168.   Argued January 20, 21, 1897. — Decided March 29, 1897.

By printed contract the Oceanic steamship company agreed with the
libellants, in consideration of the passage money paid, to land them
with their luggage in New York.   The contract ticket had attached to
it a "notice to passengers," printed in fine type, that the contract
was made subject to "conditions," among which were the following:
"3.  Neither the Shipowner nor the Passage Broker or Agent is respon-
sible for loss of or injury to the Passenger or his luggage or personal
effects, or delay on the voyage, arising from steam, latent defects in the
Steamer, her machinery, gear or fittings, or from act of God, Queen's
enemies, perils of the sea or rivers, restraints of princes, rulers and
peoples, barratry or negligence in navigation, of the Steamer or of any
other vessel: 4.  Neither the Shipowner nor the Passage Broker or
Agent is in any case liable for loss of or injury to or delay in delivery
of luggage or personal effects of the Passenger beyond the amount of
£10, unless the value of the same in excess of that sum be declared at or
before the issue of this Contract Ticket, and freight at current rates for
every kind of property (except pictures, statuary and valuables of any
description upon which one per cent will be charged) is paid."   "7.  All
questions arising on this Ticket shall be decided according to English
law, with reference to which this Contract is made."   The ticket was
purchased for libellants by their father, was not examined by him, was
not examined by them, and neither he nor they knew of these conditions,
nor was their attention called to them.   On the voyage the luggage of
libellants was flooded with water, which came in through a broken port-
hole, from causes described by the court in its statement of facts and
opinion, and which are held not to be an "act of God," necessarily ex-
empting the company from liability.   *Held*,

    (1) That by the rule in England the "conditions" were notices, and
        nothing more; and that it could not be held as matter of law that,
        whether they were regulations for the conduct of business, or
        limitations upon common law obligations, they constituted any
        part of the contract;

    (2) That the rule was not otherwise in this country;

    (3) That on the evidence the court cannot conclude that the libellants
        should be held bound, as matter of fact, by any of the alleged

---

[1] The docket title of this case is *Oceanic Steam Navigation Company,
Claimant &c. Appellant* v. *Grace Howard Potter et al.*

conditions or limitations, as they were not included in the contract proper, in terms or by reference.

The "act of God," which would exempt from liability under such circumstances, is limited to causes in which no man has any agency whatever.

LIBELLANTS, the Misses Potter and their maid, were passengers on the steamship Majestic, which sailed from Liverpool on January 20, 1892, and arrived at New York on the 28th. On disembarking, the contents of their trunks were found badly damaged by sea water, and this libel was filed in the District Court for the Southern District of New York to recover for the loss.

The libel alleged that the Oceanic Steam Navigation Company, owner of the Majestic, for a valuable consideration agreed to carry and transport libellants, with their personal baggage, to New York; and charged that the damage to the baggage was caused by negligence and want of proper care. The answer admitted the delivery of the baggage on board in good order, and its condition on arrival at New York, but put in issue the allegations of negligence and want of proper care. It set up certain stipulations as contained in the ticket under which libellants took passage, by which it was averred the ship was discharged of liability, or, in any case, was not liable for any injury beyond the amount of ten pounds; and it finally alleged that the injury, if any, was caused by the act of God or the perils of the sea, and was in nowise caused or contributed to by the neglect or misconduct of any of its agents or servants.

The so called ticket issued to the three libellants, omitting numbering and the display headings, was as follows:

## "Cabin Passenger's Contract Ticket.

*These Directions and the Notices to Passengers below, form part of, and must appear on, each Contract Ticket.*

1. A Contract Ticket in this Form must be given to every Cabin Passenger engaging a Passage in a Passenger Ship from the United Kingdom to any place out of Europe, and not being within the Mediterranean Sea, under a penalty not exceeding £50.
2. Unless the Passengers are to have a free Table, the Victualling Scale for the Voyage must be appended to the Contract Ticket.
3. All the Blanks must be correctly and legibly filled in, and the Ticket must be legibly signed with the Christian Names and Surname, and Address in full of the Party issuing the same.

## Statement of the Case.

4. The Day of the Month on which the Ship is to sail must be inserted in Words and not in Figures only.
5. When once issued, this Ticket must not be withdrawn from the passenger, nor any alteration or erasure made in it unless with his consent.

*British Steam-ship* _Majestic_ *of* _4,244_ *Tons register, to sail from* LIVERPOOL, *for* NEW YORK, *on the* _twentieth_ *day of* _January,_ 1892.

| NAMES. | No. of Persons. | |
| --- | --- | --- |
| | Adults above 12 Years. | Children. 12 Years & under. |
| | . | |
| Miss GRACE HOWARD POTTER. | a | |
| Miss B. HOWARD POTTER | a | |
| & maid. | s | |
| | | |
| | . | |
| | | . |
| | | |
| | . | |
| | | |
| | | |
| | | . |
| | | |
| | | |
| Total No. of Persons.. | Three. | |

IN CONSIDERATION of the sum of £ .124 10/ _ I hereby agree with the Person named in the margin hereof that such Person shall be provided with First Class Cabin Passage in the above-named British Steam-ship, to sail from the Port of Liverpool for the Port of NEW YORK, in North America, with not less than Twenty · Cubical Feet for Luggage for each Person, and that such Person shall be victualled as First Class Cabin Passenger during the voyage, and the time of detention at any place before its termination; and I further engage to land the Person aforesaid . with their Luggage, at the last mentioned Port, free of any Charge beyond the Passage Money· aforesaid; and I hereby acknowledge to have received the sum of £ paid in full Payment of such Passage Money.

For and on behalf of the OCEANIC STEAM NAVIGATION COMPANY, LIMITED, OF GREAT BRITAIN, THOMAS HENRY ISMAY, Per R. MARTCKELLELL. Liverpool, 16th Jan'y, 1892.

Deposit...£_____.
Balance..£_____. *to be paid at the office,* 10, *Water Street, Liverpool, one day before the above date for sailing.*
Total.....£ full

### NOTICE TO CABIN PASSENGERS.

1.—If Cabin Passengers, through no default of their own, fail to obtain a passage in the Ship, and on the day named in this Contract Ticket, they may obtain Redress for Breach of Contract by summary Process, under the 73d Section of the Passengers' Act, 1855.

2.—Cabin Passengers must produce, on Demand, their Contract tickets to the

Statement of the Case.

Government Emigration Officer under a Penalty not exceeding £10. This Ticket should therefore be preserved, and kept in readiness to be produced on board the Ship. N.B. — This Contract Ticket is exempt from Stamp Duty.

CAUTION. — To prevent the possibility of robberies occurring before the steamer leaves the wharf, Passengers are requested to be careful to leave their baggage in charge of the Company's Servants only, and to give money, jewellery and other valuables in care of the Purser, who will issue a receipt and deposit the articles in the Ship's Safe. This Ticket is only available for the date for which issued.

[SEE BACK.

[On the back :]

## " NOTICE TO PASSENGERS.

This contract is made subject to the following conditions :: —

1. The Steamer may tow and assist vessels in all situations, put back or into any port, and deviate from the direct and customary course.

2. If the Steamer shall be prevented by any cause from sailing or proceeding in the ordinary course the Passenger may, at the Shipowner's expense, be transhipped to any other steamer bound for the port of destination.

3. Neither the Shipowner nor the Passage Broker or Agent is responsible for loss of or injury to the Passenger or his luggage or personal effects, or delay on the voyage, arising from steam, latent defects in the Steamer, her machinery, gear, or fittings, or from act of God, Queen's enemies, perils of the sea or rivers, restraints of princes, rulers, and peoples, barratry or negligence in navigation, of the Steamer or of any other vessel.

4. Neither the Shipowner nor the Passage Broker or Agent is in any case liable for loss of or injury to or delay in delivery of luggage or personal effects of the Passenger beyond the amount of £10, unless the value of the same in excess of that sum be declared at or before the issue of this Contract Ticket, and freight at current rates for every kind of property (except pictures, statuary, and valuables of any description upon which one per cent. will be charged) is paid.

5. The Passenger is not liable in respect of his luggage or personal effects to pay or entitled to receive any general average contribution.

6. If the Passenger does not use this Ticket for the ship and date mentioned on the face of it, or if it is lost or mislaid, it is to be considered as cancelled and the passage money will be absolutely forfeited.

7. All questions arising on this Ticket shall be decided according to English law, with reference to which this Contract is made.

For and on behalf of the
OCEANIC STEAM NAVIGATION COMPANY, LIMITED, OF GREAT BRITAIN,

THOMAS BRUCE ISMAY."

## " New United States Immigration Act, in effect April 1st, 1891.

The following Information is required by the United States' Authorities before Passengers will be permitted to land. Agents will please either fill up the blanks or request Passengers to do so themselves."

[Here followed certain unfilled blanks.]

The signature " R. Martckellell " was in writing, the other signatures in print.

The ticket was purchased at London by direction of the father of the young ladies; was brought to the office of his firm; and, as was usual, was held in a particular department until given to those for whom it was intended; he had no rec-

ollection of having seen it, and, if he did, did not examine it. One of the libellants received the ticket in an envelope; did not look at it, and knew nothing of its contents, and the others did not see it. There was no proof whatever that Mr. Potter or the libellants ever had their attention called to the notices on the back of the paper, or ever read or assented to what was printed thereon.

The injured baggage was checked from London to New York direct, after it had been properly marked and labelled for the hold, in accordance with an arrangement between the steamship company and the London and Northwestern Railway for checking baggage through, the practice of the company being to furnish its alternative labels for passengers' baggage, indicating the place in which the baggage should be put.

The baggage was not put in the hold proper but stowed in compartment No. 3 of the Orlop deck, where the mails were also. This compartment was about twenty-five feet in length, had watertight bulkheads at each end, was ordinarily a safe place for the baggage of passengers, and frequently so used. It had three or four portholes on each side, considerably above the water line, closed in the usual way, with glass, covered over with an iron protector called a dummy.

On the morning of January 25, it was found that a porthole was broken in Orlop No. 3, and that the whole compartment was flooded with sea water. On which side of the ship the shattered porthole was located was not shown.

The log contained this entry: "Jany. 25th. Commenced with clear weather and a high westerly swell. From seven to eight A.M. vessel passed through a quantity of wood, apparently deck planking, and about eight A.M. it was found that the after port in the mail room had been broken through by the sea or by wreckage, and that a large quantity of water had found its way in and damaged the mails and baggage. The broken port was at once replaced by a spare one, and measures were taken to remedy the damage as much as possible."

The captain testified: "When I got up in the morning, the

first thing I saw when I came out of the chart room were some planks, floating wreckage that the ship had evidently passed through in the dark, and was passing through at the time; and there was a pretty rough sea. I saw this port after it was stove in, and it was forced right in. The glass had broken in a great many pieces, and the iron dummy protecting it was forced off the hinges and turned right back— which could not possibly have been done by the sea alone."

The chief officer was called as a witness by libellants, and testified that he was on the bridge on the morning of the 25th from six to eight; that they "had rough seas; a bad choppy sea"; that he "saw one piece of wreckage; it looked like deal; it was a good sized piece of timber; it was on the port side, away from the ship." His evidence leaves it doubtful whether he inspected Orlop No. 3 on the day the voyage commenced. As to whatever inspection he made, he states: "I merely opened the watertight door and looked in." At first he said that he had not made an examination of Orlop No. 3 before the 25th since leaving port, but afterwards that he was mistaken and that he was down to the Orlop "the day after we left Queenstown"; and that the accident might have occurred on any one of the intervening days. He was asked on cross-examination on behalf of the steamship: "What called your attention to this damage to the baggage? A. The wash of the water when I opened the door. You see, it is all in total darkness." He was further asked and answered on cross-examination as follows: "Q. Were these portholes in Orlop No. 3 just as securely protected as any of the other portholes in the hold? A. Oh, yes; more so if anything. They are examined by an officer in Liverpool, and he signs a paper to that effect — says the ports are secure. Q. Were these ports examined on this voyage in Liverpool? A. Yes, sir." There was no other evidence as to inspection at Liverpool in respect of the security of the ports.

Decree was entered in favor of libellants for the full amount of damages claimed together with interest and costs. 56 Fed. Rep. 244. From this decree the steamship company appealed to the Circuit Court of Appeals for the Second Circuit. After

the appeal was taken, a motion was made before a judge of that court for leave to take new proofs under the rules of that court, which was denied. Subsequently claimant moved for leave to put in evidence certain reported cases, and this motion was denied.

The Circuit Court of Appeals directed the District Court to enter a decree in favor of each of the libellants for the sum of $48.67 and interest from January 25, 1892, and costs in the District Court, with costs of the appeal to the company. 20 U. S. App. 503. Whereupon the cause was brought here by a writ of certiorari. Afterward diminution of the record was suggested, and a writ of certiorari issued to bring up the transcript of the proceedings on the application to take additional testimony, etc., and it was transmitted accordingly; but as the court found nothing justifying revision in this regard this requires no further notice.

*Mr. Frederick W. Whitridge* and *Mr. Willard Parker Butler* for libellants.

*Mr. Everett P. Wheeler* for steamship company.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

By the contract in this case, the steamship company agreed, to land libellants with their luggage at the port of New York, and none of the alleged exceptions or conditions were referred to therein. They were notices and nothing more, and it cannot be held as matter of law, that, whether they were regulations for the conduct of business or limitations upon common law obligations, they constituted any part of the contract.

Such is the rule in England, where this contract between the ship owner, a British corporation, and citizens of the United States, was entered into.

In *Richardson, Spence & Co. et al.* v. *Rowntree*, (1894) App. Cas. 217, the respondent had paid passage money for a voy-

age on appellants' steamer, and had received a ticket folded up so that no writing was visible unless she opened it, but on which were the words: "It is mutually agreed for the consideration aforesaid that this ticket is issued and accepted upon the following conditions." One of the conditions was: "The company is not under any circumstances liable to an amount exceeding 100 dollars for loss of or injury to the passenger or his luggage." Respondent having brought an action against appellants to recover damages exceeding one hundred dollars for personal injuries, certain questions were left to the jury, in response to which they found that she knew there was writing or printing on the ticket, but did not know that the writing or printing contained conditions relating to the terms of the contract of carriage, and that appellants did not do what was reasonably sufficient to give her notice of the conditions; and returned a verdict in her favor for one hundred pounds. The House of Lords affirmed the judgment of the Court of Appeal that there was evidence upon which the jury could properly find as they did, and that judgment was properly entered for plaintiff upon the findings.

The Lord Chancellor, Lord Herschell, said: " Now, those are questions which the majority of the Court of Appeal, in the case of *Parker* v. *South Eastern Railway Company*, pointed out, by their judgment, ought to be left to the jury. That was a case, in its broad features, very similar to this, inasmuch as the plaintiff there had deposited some luggage at the luggage office of one of the railway companies, and received in return for the deposit of the luggage a ticket on which there was printed ' See back,' and on the back were certain conditions by which it was sought to limit the liability of the com. pany. The majority of the Court of Appeal held that they could not say, as matter of law, that by reason of taking that ticket in exchange for the goods the plaintiff was bound by the conditions; that there were questions to be determined by the jury, and that upon their determination would depend the liability of the defendants.

" My Lords, the only question that now comes before this

House is whether there was any evidence to go to the jury upon which they could properly find the answer that they did to the last two questions. Now, what are the facts, and the only facts, bearing upon this question which were proved before the jury? That the plaintiff paid the money for her passage for the voyage in question, and that she received this ticket handed to her folded up by the ticket clerk, so that no writing was visible unless she opened and read it. There are no facts beyond those. Nothing was said to draw her attention to the fact that this ticket contained any conditions; and the argument of the appellants is, and must be, this, that where there are no facts beyond those which I have stated the defendants are entitled, as a matter of law, to say that the plaintiff is bound by those conditions. That, my Lords, seems to me to be absolutely in the teeth of the judgment of the Court of Appeal in the case of *Parker* v. *South Eastern Railway Company*, with which I entirely agree; nor does it seem to me consistent with the case of *Henderson* v. *Stevenson* in your Lordships' House when that case is carefully considered." *Parker* v. *South Eastern Railway Company*, 2 C. P. D. 416; 1 C. P. D. 618; *Henderson* v. *Stevenson*, L. R. 2 H. L. Sc. 470.

In *Henderson* v. *Stevenson*, a ticket having on its face only the words "Dublin to Whitehaven," was given by a steam packet company to a passenger, who without looking at it, paid for it, and went on board their steamer. The ship was wrecked, the passenger lost all his luggage, and brought an action against the company. The defence was that on the back of the ticket these words were printed: "This ticket is issued on the condition that the company incur no liability whatever in respect of loss, injury or delay to the passenger, or to his (or her) luggage, whether arising from the act, neglect or default of the company or their servants, or otherwise." Judgment was given against the company and affirmed by the House of Lords. The Lord Chancellor, Lord Cairns, said, among other things: "It seems to me that it would be extremely dangerous, not merely with regard to contracts of this description, but with regard to all contracts, if it were to

be held that a document complete upon the face of it can be exhibited as between two contracting parties, and, without any knowledge of anything beside, from the mere circumstance that upon the back of that document there is something else printed which has not actually been brought to and has not come to the notice of one of the contracting parties, that contracting party is to be held to have assented to that which he has not seen, of which he knows nothing, and which is not in any way ostensibly connected with that which is printed or written upon the face of the contract presented to him. I am glad to find that there is no authority for such a proposition in any of the cases that have been cited." It was held that a mere notice from the steam packet company, without the passenger's assent, would not discharge it from performing its duty to carry safely and securely unless prevented by unavoidable accident.

The rule is not otherwise in this country, and is stated in Wheeler on the Modern Law of Carriers, 263, thus: "A notice or memorandum, even though printed upon the bill of lading or other contract of the carrier, unless referred to in the body of the contract and thus made a part of it, is no more than a notice, and does not form a part of the contract between the shipper and the carrier."

In *Michigan Central Railroad* v. *Mineral Springs Manufacturing Co.*, 16 Wall. 318, it was held that although a common carrier might limit his common law liability by special contract, assented to by the consignor of goods, an unsigned notice printed on the back of a receipt did not amount to such contract, though the receipt with such notice on it might have been taken by the consignor without dissent. And *New Jersey Steam Navigation Company* v. *Merchants' Bank*, 6 How. 344, was cited to the point that nothing short of an express stipulation by parol or in writing should be permitted to discharge the carrier from duties which the law has annexed to his employment.

In *New York Central & Hudson River Railroad* v. *Fraloff*, 100 U. S. 24, 27, this court said: "It is undoubtedly competent for carriers of passengers, by specific regulations, *distinctly*

*brought to the knowledge of the passenger*, which are reasonable in their character and not inconsistent with any statute or their duties to the public, to protect themselves against liability, as insurers, for baggage exceeding a fixed amount in value, except upon additional compensation, proportioned to the risk."

In *Malone* v. *Boston & Worcester Railroad*, 12 Gray, 388, it was ruled that there was no presumption of law that a passenger on a railroad has read a notice limiting the liability of the railroad corporation for baggage, printed upon the back of a check delivered him, having on the face the words " Look on the back," and that the question of notice was properly submitted to the jury as a question of fact. And see *Brown* v. *Eastern Railroad*, 11 Cush. 97 ; *Merchants' Despatch Transportation Co.* v. *Theilbar*, 86 Illinois, 71 ; *Rawson* v. *Pennsylvania Railroad*, 48 N. Y. 212 ; *Wilson* v. *Chesapeake & Ohio Railroad*, 21 Grattan, 654.

On the evidence, we are unable to conclude that the libellants should be held bound, as matter of fact, by any of the alleged conditions or limitations. They were not included in the contract proper, in terms or by reference.

The contract was signed in writing on behalf of the steamship company, but the notices were not. Libellants did not sign, nor were they required to do so, nor was it contemplated that they should.

The ticket was sent to the office of the father of two of the libellants and was forwarded or handed to one of them in an envelope. It was not seen by her until taken up in the middle of the ocean, nor by either of the others at all. The attention of neither of them was called to the notices, nor in any way to the ticket, nor had either of them read it, or read any of the printed matter, in fine type, by which the contract for passage was surrounded. The father of the two young ladies had directed passage to be engaged, and it is true that he had been in the habit of using such tickets himself in crossing, but there was no evidence that his attention had ever been particularly called to them ; he had never read them ; and he had no idea that the limitations contended for had ever been claimed to have been imposed thereby.

We quite agree with Lord O'Hagan in *Henderson* v. *Stevenson*, that "when a company desires to impose special and most stringent terms upon its customers, in exoneration of its own liability, there is nothing unreasonable in requiring that those terms shall be distinctly declared and deliberately accepted."

But while we hold that libellants were not subjected to these alleged conditions and limitations, and that, therefore, the Court of Appeals erred in its conclusion that each of them was limited in recovery to £10, a limitation which we must say does not strike us as exactly reasonable in view of the "twenty cubical feet" of luggage for each, which the company had expressly contracted to carry, the question still remains, on the doctrine of implied exceptions, whether the injury here was by the act of God, for which the company was not liable. The burden in this respect is on the carrier. *Clark* v. *Barnwell*, 12 How. 272; *Transportation Company* v. *Downer*, 11 Wall. 129; *The Edwin I. Morrison*, 153 U. S. 199; *The Caledonia*, 157 U. S. 124.

The act of God, said Chancellor Kent (vol. 2, p. 597), means "inevitable accident, without the intervention of man and public enemies"; and again (vol. 3, p. 216), that "perils of the sea denote natural accidents peculiar to that element, which do not happen by the intervention of man, nor are to be prevented by human prudence. A *casus fortuitus* was defined in the civil law to be, *quod damno fatali contingit, cuivis diligentissimo possit contingere.* It is a loss happening in spite of all human effort and sagacity." The words "perils of the sea" may, indeed, have grown to have a broader signification than "the act of God," but that is unimportant here.

Judge Shipman in the Court of Appeals quotes from 1 Parsons on Shipping, 255, the definition there given of the "act of God," and the reason for it, as follows: "The 'act of God' is limited, as we conceive, to causes in which no man has any agency whatever; because it was intended never to raise, in the case of the common carrier, the dangerous and difficult question whether he actually had any agency in causing the loss; for, if this were *possible*, he should be held."

We think it quite clear that the damage complained of can-

not be held to have been the result of such inevitable accident. The evidence was wholly unsatisfactory as to any inspection of the porthole before the vessel left Liverpool. What the chief officer says in that regard, in answer to leading questions, is manifestly not of his own personal knowledge, but on the assumption that such inspection had taken place, because it should have, which could have been established, yet was not, by calling the person whose duty it was to make it. Whether the ports were properly closed when the vessel sailed was not made out, nor was any such inspection of the compartment, after she sailed, proven, as, if the ports were not properly closed, would have detected the fact. The two or three feet of water in the mail room, Orlop No. 3, was perhaps not more than might have been taken in during the first four or five days of the voyage, if the port were not securely fastened and partially open. As remarked by the District Judge, whether the covers to all of the ports in the mail room, where this baggage was placed, were screwed down tight, or whether some of them were left open for light or any other purpose, was not affirmatively shown. The theory of the defence was that the breaking of the port was caused by floating wreckage, and while that might possibly have been so, there was no evidence directly tending to establish it as a fact. If it had been shown that when the vessel sailed the ports were in proper condition and properly closed, and that this was their condition on the day before the accident was discovered, that would have presented a different question. The captain testified that the iron dummy was turned back in a way which could not have been done by the sea, but he admitted that his memory was treacherous, after the lapse of time; and the log stated that the port was broken "either by the sea or by wreckage," while the chief officer, who was on the bridge, as the captain was not, said that, between six and eight that morning, he saw only one large piece of wreckage, which was "a good sized piece of timber"; "on the port side; away from the ship."

And, as Judge Brown held, if the wreckage referred to was of a kind adequate to force open an iron cover properly constructed and firmly screwed down over the port, then it de-

volved upon the company to show why the ship did not steer away from the wreckage or slacken speed while passing through it; and this was not attempted. In our opinion the steamship company failed to show that the accident was one which could not have been prevented by human effort, sagacity and care, and we perceive no reasonable ground for disagreeing with the judgment of the District Court upon the facts.

*The order of the Circuit Court of Appeals is reversed, and the decree of the District Court affirmed, with costs.*