WEST HARTLEPOOL STEAM NAVIGATION CO., Limited, v. 450 TONS OF KAINIT et al.

(District Court, E. D. Georgia. S. D. February 16, 1907.)

1. SHIPPING—CESSER CLAUSE OF CHARTER PARTY—LIEN ON CARGO OWNED BY THIRD PARTY.

The cesser clause of a charter party cannot create a lien in favor of the vessel on cargo owned by a third party, without a meritorious claim for liability against the goods or their owner, unless such owner is shown to be privy to the charter.

2. SAME—BILL OF LADING—MARGINAL NOTE REFERRING TO CHARTER PARTY.

A marginal note on a bill of lading reading, "Discharge and all other conditions as per charter party dated Hamburg, 18th April, 1906," it not appearing by whom it was written, is not any part of the contract, nor does it make a provision of the cesser clause of the charter party giving the vessel a lien on the cargo for demurrage binding on the consignee, who was not a party thereto.

3. SAME—CONSIGNEE OF CARGO—DEMURRAGE.

The consignee of a cargo, under bills of lading which obligated it only to receive the cargo as delivered by the vessel, leaving the duty of discharging upon the vessel or the charterer, is not subject to the provisions of the charter party respecting the time for discharging or demurrage, nor, if liable for demurrage because of failure to receive the cargo as delivered, is such liability measured by the stipulated penalty provided in the charter party as between the owner and charterer, but is to be determined by evidence as to the actual damage resulting from its neglect or default.

In Admiralty. Libel in rem and in personam for demurrage.

William R. Leaken and Convers & Kirlen, for libelant.

Walter G. Charlton, for claimant and respondent.

SPEER, District Judge. The West Hartlepool Steam Navigation Company, Limited, a British corporation, presents a libel in rem against 450 tons of kainit. This is a portion of the cargo of the ship Bolton-hall. There are also charges in personam against Hamburg-Ameri-kanische Packetfahrt-Aktien Gesellschaft, the Hamburg American Line, Paul Klembt, the Southern Shipping Company, the Virginia Carolina Chemical Company, and E. W. Mansfield. The libel alleges that on the 18th of April, 1906, at Hamburg, Germany, the British steamship Boltonhall was chartered for a voyage from that port to Savannah, Ga., by the Hamburg-American Line, to safely carry and deliver a cargo of kainit to the Southern Shipping Company at the latter port, their agents, or such party or parties as should be designated by them for delivery. Bills of lading were delivered by the master of the vessel, acting for the owner, to Paul Klembt for the Hamburg-American Line, and by due course of indorsement were finally delivered to the Virginia Carolina Chemical Company, which is the owner of the kainit. It was provided by the charter party that the steamer should "be discharged at port of discharge at not less than an average of three hundred tons per weather working day," with the penalty that, "if detained longer, demurrage to be paid 4 pence British sterling per ton gross register for every day so detained." Stipulation was also made as follows:

"The cargo to be brought to and taken from alongside the steamer at char-terer's risk and expense. * * * The steamer to employ charterer's or their agent's stevedore and tally clerks for loading, stowing and discharging the cargo at the usual lowest charge at port of loading and port of discharge; charterer's responsibility to cease on shipment of cargo, but steamer to have an absolute lien upon the cargo for all freight, deadfreight and demurrage. The steamer is to be discharged at one or two wharves at her expense as or-dered by consignees within 24 hours after steamer has been entered at the custom house, consignees guaranteeing sufficient depth of water."

The charter party also required "the cargo to be brought to and taken from alongside the steamer at charterer's risk and expense," and was signed by Paul Klembt, the Hamburg-American Line, and by the agents of the owners. The bill of lading in the thirteenth clause stipulates:

"Goods to be taken from the ship by the consignees directly they come to hand in discharging the ship, and the carrier's responsibility to cease, package by package, immediately the goods leave the ship's deck or tackle. If not taken from alongside by the consignees, they will be landed and deposited at the expense of the consignee, and at his risk of fire, loss or injury, on the dock, or in warehouse, or in craft, the collector of the port being hereby authorized to grant a general order for the discharge, immediately after the entry of the ship."

It is evident that this does not relieve the ship or the charterer of the duty of discharging the cargo. The only obligation upon the consignee is to take the goods. This construction of the provision in the bill of lading is avoided by the clause in the charter which requires the ship, through its own agent and at its own expense, to discharge the cargo "at one or two wharves," depth of water being guarantied.

The Virginia Carolina Chemical Company, the consignee, presents its response and claim to the kainit libeled. It avers that, "having

paid the full value therefor, claimant was entitled to receive from said vessel, or from whoever was invested with authority in the premises, the said cargo of kainit without unreasonable delay." The claimant protests that it "has and had no concern with the terms of the charter party, or any other agreement between the owners of said Boltonhall, and any charterer, shipper, consignor, freighter, or consignee, and is in no wise bound by any stipulations, agreements, or understandings" between them. The libelant contends that the consignees are bound by the provision in the charter party for the discharge of the cargo at the rate of not less than 300 tons a day. It insists that, the discharge not having been effected in this time, the consignee is liable under the cesser clause of the contract for demurrage, as a penalty for a delay of nine days and two hours. The cesser clause in this charter is as follows:

"Charterer's responsibility to cease on shipment of cargo, but steamer to have an absolute lien upon the cargo for all freight, deadfreight, and demurrage."

The consignee disclaims all liability under this clause. It points out that no time for the unloading was fixed in the bill of lading, that a reasonable time under all the circumstances of the case would be allowed, and that, in view of the evidence in this case, the time occupied was reasonable.

The delay was occasioned by a strike, of a general and aggravated character, in effect among the laborers of the stevedores in Savannah. It was impossible, the consignee contends, for the stevedores to unload the vessel, notwithstanding very diligent efforts were made to secure labor; but that in no event, since the obligation was on the vessel or the charterer to unload, and since the vessel undertook this duty through its own agents, Smith & Kelley, is the consignee—which has at all times been ready to accept the freight—responsible for the delay? The claim of the libelant is based solely upon the cesser clause. There is no charge of negligence or willful delay against the consignee. It is to be observed that the owner of the kainit, brought over in the Boltonhall, did not sign the charter party. It does not appear that it was ever exhibited to the consignee. It is true that the owner accepted the bill of lading—which had a marginal reference in writing to the charter party—but it did not receive or accept its kainit until the loss on account of the demurrage had been fully incurred. It is alleged in the libel that the master secured the services of the stevedores under the designation of the charterer's agents at this port. It appears from the proof that he superintended the discharge of the vessel, and the consignees had nothing whatever to do with it. The loss, if any, resulted from the inability of the charterer's agents to unload the ship as they were obliged to do. The consignee incurred no responsibility for the failure to unload. The ship was obliged to deposit its goods in one or two wharves, and there is no pretense that the consignee had any actual participation in the failure to place the kainit as stipulated. It is true that the penalty for demurrage is explicitly stated in the charter party, but the contract is between the shipowner and the charterer. Charter parties are construed like

other contracts. It is also true that the charter party gives the ship-owner a lien upon the cargo. This, as we have seen, is a part of the cesser clause. With reference to this, we find in Hughes on Admiralty, p. 165, the following:

"A curious provision in modern charter parties is the clause known as the 'cesser clause.' Its usual language is, 'Owner to have a lien on the cargo for freight, deadfreight, and demurrage, charterer's liability to cease when cargo is shipped.'"

Such clauses are always strictly construed. Applying this principle to the facts under consideration, I conclude that had the cargo belonged to the charterer, and were the charterer at fault, the lien of the cesser clause might be effective. But the title to the kainit was not in the charterer, it was in the consignee, and no lien created by the charter party—however explicit its literal expression—can be enforced against the goods of a third party, without a meritorious claim for liability against such goods or such party, unless that party is clearly shown to be privy to the contract creating the lien.

The libelant insists, however, that the consignee who received the goods is bound in this case by reason of a certain memorandum in writing inserted in the margin of the bill of lading, as follows:

"Discharge and all other conditions as per charter party dated Hamburg, 18th April, 1906."

This marginal reference is not in the body of the bill of lading, and this is the more significant for the reason that other marginal references to freight are distinctly referred to within the bill. There is no proof when or how this memorandum was inserted. It is not any part of the contract. The Supreme Court of the United States, in United States v. Kimbal, 13 Wall. 636, 20 L. Ed. 503, holds that:

"A marginal note put by the quartermaster's Department on bills of lading of vessels chartered by them, 'that if on the arrival of the vessel at the port of destination, the consignee should order her to another place to discharge, such order in all cases to be in writing on the bill of lading,' does not make a part of the contract entered into by the vessel."

A fortiori, would this not be binding on the consignee. See, also The Majestic, 166 U. S. 384, 17 Sup. Ct. 597, 41 L. Ed. 1039; Wheeler on the Modern Law of Carriers, 263.

But let it be supposed that the text of the bill of lading contained this marginal reference. Said the Supreme Court in Crossman v. Burrill, 179 U. S. 109, 21 Sup. Ct. 41 (45 L. Ed. 106):

"The provision of the charter party, which 'requires the bills of lading to be signed as presented, without prejudice to this charter,' while it obliges the master to sign bills of lading upon request of the charterers, does not mean that the bills of lading, or the consignee holding them, shall be subject to all the provisions of the charter; but only that the obligations of the charterers to the ship and her owners are not to be affected by the bill of lading so signed."

The court continues:

"The bills of lading, as already mentioned, provide only for 'paying freight for said lumber as per charter party dated 7th March, 1893, and average accustomed.' They do not mention demurrage, or refer to any provisions of the charter, other than those concerning freight and average. It is well settled that a bill of lading in such a form does not subject an indorsee thereof, who

receives the goods under it, to any of those other provisions of the charter. It does not give him notice of, or render him liable to, the specific provisions of the charter, which require a discharge of a certain quantity of lumber per day, or, in default thereof, the payment of a specific sum for a longer detention of the vessel; but he is entitled to take the goods within a reasonable time after arrival, and is liable to pay damages for undue delay in taking them, according to the ordinary rules of law which govern in the absence of specific agreement."

This is precisely in point. It is true that the bill of lading here does give to the shipowner a lien for demurrage occasioned by the negligence or other misconduct of the shipper or consignee. This demurrage is to be determined as usually by reference to the evidence, and is not in any sense dependent upon a stipulated penalty or forfeiture, like that sought to be enforced through the cesser clause. Here no actual damages are either alleged or proven. The penalty is sought to be enforced in strict accordance with the cesser clause, and that is all.

It follows that the Virginia Carolina Chemical Company is not bound by the cesser clause or the penalty for its violation. The claim for the penalty, and the assertion of a lien therefor against the property of that company, must fall, and since there is no other claim for demurrage, and since the company has produced a receipt for $5,000 which evidences payment of the freight in full, the libel against it must be dismissed.

While the respondents to the prayers in personam of the libel may have been served, nothing was proven on the trial or claimed against them in argument. The proctor for libelant restricted his attention exclusively to the alleged lien against the cargo under the cesser clause. This is probably ascribable to the facts developed in evidence. He doubtless realized that a court of admiralty is a court of equity, and that a claim against these parties must be determined with due regard to equitable principles. Now there is no specific date for unloading the vessel mentioned either in the charter party or in the bill of lading. The claim for demurrage, as we have seen, must be based upon the facts of the case, and would not be allowed if the ship was unloaded in a reasonable time in view of all the evidence.

Now what was the evidence which embarrassed the good ship Boltonhall and her master? When she reached Savannah, she was confronted by a strike among the longshoremen, the laborers of the stevedores. These were American citizens of African descent. They peremptorily demanded an increase of 33⅓ per cent. in their wages. They also demanded the discharge of a foreman, a white man who had long been in the service of the stevedores, and against whom nothing whatever is made to appear. The strike was so vicious in character that the Georgia state troops were assembled under arms in their armory. The stevedores could exert no influence on their former employés. They, however, sent out to the contiguous country, and brought in 400 men. These were carried across the river and guarded by other men armed with rifles. This, it is said, was done for the purpose of protecting them from the threatened attacks of the strikers, but, in view of the somewhat heroic measures which are occasionally

adopted in these parts, I apprehend that the brave guardians of the imported laborers were also instructed not to permit their wards to escape. Be this as it may, it illustrates how difficult of performance was the unloading of the vessel, which the ship's agents were under obligation to perform. This vis inertia on the part of the longshoremen might well be pleaded—as the claimant has in effect done—as a defense of vis major. The Supreme Court, in Crossman v. Burrill, supra, defines a vis major as "a superior force, acting directly upon the discharge of the cargo, * * * an unusual and extraordinary interruption that could not have been anticipated when the contract was made." It is probably true that the sullen and immovable obstinacy of the longshoremen, with the display of force deemed necessary as a consequence to meet the situation in Savannah at that time, is in effect equivalent to the South American revolution which the Supreme Court in that case held was a good defense of vis major. In any event, no decree has yet been sought against the other respondents in personam. The libel in rem, as to that portion of the cargo belonging to the Virginia Carolina Chemical Company will be dismissed with costs, as will also the libel in personam, so far as it is sought to make that company liable. Since other respondents within the jurisdiction of the court were not assailed—although their counsel were present—they made no defense, and as to them no decree will be taken, unless motions to dismiss for want of prosecution should be made.