THE OLAF.

## MIKKELSEN v. A CARGO OF SUGAR.

(District Court, E. D. Pennsylvania. January 26, 1918.)

No. 3 of 1917.

1. SHIPPING ☞173—CHARTERS—SUIT FOR DEMURRAGE—ISSUES.

A charterer, which assumed the work of discharging the cargo without question, cannot defend against a suit for demurrage on the ground that the duty of discharge was not imposed on it by the charter party.

2. SHIPPING ☞177—DEMURRAGE—CONSTRUCTION OF CHARTER PARTY—"WORKING DAYS."

Under a charter for the carriage of a cargo of sugar, which required discharge at the rate of 5,000 bags per "working day," the charterer as-

sumed the risk of delay due to strikes, bad weather, or any other cause not expressly excepted in the charter party, in the absence of any local usage at the port of discharge giving to the term "working days" a meaning at variance with its accepted legal meaning of calendar days, exclusive of Sundays and holidays.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Working Days.]

**3.** Shipping ☞177—Demurrage—Construction of Charter Party.

Under a charter party requiring discharge of 5,000 bags of sugar in each working day, no account is to be taken of half days; but the charterer is entitled to a full working day for each 5,000 bags before liability for demurrage commences.

**4.** Shipping ☞179—Construction of Charter Party—"Default."

The word "default," as used in charter party contracts, does not convey the idea of "fault," but of mere failure to perform; and the lack of performance, if there is such lack, exists without regard to how it came about, subject to the vis major doctrine.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Default.]

**5.** Shipping ☞181—Demurrage—Construction of Charter Party—"24 Hours after Arrival of Vessel."

A provision of a charter party that lay days for discharging shall begin "24 hours after the arrival of the vessel" does not mean that the charterer is entitled to a full working day before beginning to discharge, but is to be read literally; but where the time limit expires on a day which is not a working day the lay days commence with the next working day.

**6.** Shipping ☞179—Demurrage—Defenses.

A consignee of a sugar cargo is not relieved from liability for demurrage by the vis major principle, because of a custom house regulation under which the discharge of sugar in wet weather may be prohibited, where such authority was not exercised, and the regulation did not in any way affect the discharge of the vessel.

**7.** Shipping ☞177—Demurrage—Apportionment to Fractions of Day.

Per diem demurrage, fixed by a charter party, is not apportionable to fractions of a day.

**8.** Shipping ☞179—Demurrage—Defenses.

A consignee is not relieved from liability for demurrage, under the doctrine of vis major, on the ground that the delay was caused by the refusal of the stevedores to work; the reason for such refusal not being shown.

**9.** Shipping ☞171—Charters—Demurrage—Suit Against Consignee.

Where a charter of a ship to carry a cargo stipulated for a per diem demurrage, gave the owner a lien on the cargo therefor, and provided that bills of lading should be signed without prejudice to the charter, and a subcharter, made before the cargo was loaded, contained the same provisions, including that for the per diem demurrage, as did also the bills of lading signed thereunder, with respect to lien and their being subject to the charter, the shipowner may maintain a suit for demurrage against the cargo, on delivery to an indorsee of the bills of lading, based on the contract made by the original charter party.

In Admiralty. Suit for demurrage by George Mikkelsen, master of the steamship Olaf, against a cargo of sugar; the Franklin Sugar Refining Company, claimant. Decree for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa., for libelant.

Benjamin O. Frick, and Prichard, Saul, Bayard & Evans, all of Philadelphia, Pa., for respondent.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

DICKINSON, District Judge. A discussion of the questions which are presented by this record to be answered may well precede a statement of the facts to be found, as the number of the latter, which are of importance, is determined by the former. The respondent raises substantially four objections to the allowance of the claim made by the libelant.

[1] (1) The first goes to the very root of the case, because it is a denial of any obligation on the part of the respondent to discharge the cargo. If this position be found well taken, it follows that no responsibility, for the consequences of delays in discharging the cargo, can be visited upon the respondent.

We feel, however, relieved of any call to decide or to consider this branch of the defense, because the respondents themselves interpreted the charter party as one imposing the duty of discharge upon them, by assuming it and undertaking the work of discharge. After thus waiving their right (if they had one) to require the libelant to deliver the cargo upon the wharf, it is too late now to make their stand upon it. The issue thus presented is one not raised by the pleadings and one no notice of which was given before trial, nor was it sought to be brought in by amendment. The position is clearly an afterthought, no suggestion of which is disclosed by the answer, but the thought of which was first revealed at the trial of the case.

The answer states that the respondent assumed the task of unloading the vessel, in the course of which difficulties were encountered which caused interruption of the work and consequent delays which the respondent claimed excused performance; but there was no hint of the thought of a denial of the duty to discharge with such dispatch as that the vessel would not be unduly delayed.

A point was made of this by the libelant at the trial in the assertion of the position that the respondent cannot avail itself of a defense not set up in the answer, and objection was promptly interposed to its consideration. Everything which the respondent asked to have the record show in support of this position was permitted to go upon the record, subject to the objection, for such appellate use as the respondent has the right to make of it. We adhere, however, to the ruling indicated. Brooks v. Hilton (D. C.) 221 Fed. 265; Barber v. Lockwood (D. C.) 134 Fed. 985.

[2] (2) The second branch of the defense is that the discharge of the cargo was prevented, and the consequent detention of the vessel was caused by the inability and refusal of the employés of the respondent, who were engaged as stevedores, to continue the work of discharging the vessel. This was in part the consequence of a strike which had been declared. The delay in discharging the vessel was further due to bad weather conditions, under which the men did not work.

Respecting the first subdivision of these claimed excusing facts, it is to be stated that the strike was not declared until after the vessel should have been discharged, and therefore has no bearing upon the detention of the vessel, beyond increasing the duration of the detention.

Respecting the facts which make up the second subdivision of the excusing conditions, it may be stated that the existence in fact of what may be called the weather excuse is most seriously denied. Here again, with respect to these delays, to whichever of these causes due, the construction we give to the contract is such as to make the considerations, above suggested, of no moment, because we are of opinion that the undertaking was an absolute one to discharge within a time which was measured by the bulk of the cargo, and that the risk of every delay, except those mentioned in the charter party, was assumed by the consignee. Hagerman v. Norton, 105 Fed. 996, 46 C. C. A. 1; Fish v. Brown Stone (D. C.) 20 Fed. 201.

The cargo consisted of 19,400 bags of sugar. The time of discharge in days was measured by an output of 5,000 bags per "working day." This, although a minimum measure of discharging dispatch, is under the conditions of this case a definition of "customary quick steamer dispatch at the port of discharge." It follows that the time allowance for discharge was four working days, and as soon as we translate working days into calendar days we are enabled to fix the time when the demurrage allowance begins to run.

Disregarding the earlier movements of the vessel, which do not enter this discussion, she was at the wharf ready to discharge her cargo, and the discharge was in fact commenced, on the morning of February 3, 1917. This was Saturday, which, in this port, was a holiday, or at least a half holiday, in the sense that it is a holiday from the noon hour on. The next day being Sunday, if we exclude holidays and Sundays as not work days, and as not "working days," within the meaning of this contract, the consignees were entitled to the four days from the 5th to the 8th, both inclusive, before the demurrage began to run. The vessel was discharged at the close of the working day on the 16th, and on this basis demurrage would be chargeable from the 9th to the 16th, both inclusive, or a total of eight days.

It is not unusual, particularly of recent years, to find incorporated in many contracts a provision to the effect that performance is excused by or during the duration of strikes. There is, however, no such provision in this charter party. There is also in somewhat common use a phrase, frequently employed in charter parties, such as "weather working days," or an equivalent expression. It is to be observed that the phrase employed in this charter party is simply "working days." These words have an established meaning in construing charter party contracts.

This found meaning is that "working days" are calendar days, exclusive of Sundays and holidays, without reference to weather or other excusing conditions. It is not necessary to be held, and in consequence it is not now held, that the words of a contract, which is to be construed as of the place of performance, will not yield their otherwise accepted meaning to the local usage meaning of that locality, because of the finding, hereinafter made, that there is no meaning of the phrase local to the port of Philadelphia at variance with its accepted legal meaning.

[3] (3) The third phase of the defense, which is that 24 hours'

grace was allowed to the consignees before the count of time against them began, becomes wholly immaterial, as the doctrine, if accepted, would work no change in the result. There is in further consequence nothing to be gained by discussing the principle which respondent asks to have applied. In the counting above made, there is involved what may be called the doctrine of half days. There is among those concerned with shipping contracts a widespread notion, of which notice must be taken by the courts, that days may be apportioned, at least into days and half days. It is to be observed, however, that this charter party provides its own measure of time or count of days before the demurrage days begin to run. In a contract providing a per diem demurrage charge, it might be that half days should be taken into consideration; but in a charter party in which, as in this one, a day is defined in terms, not of hours, or of lightness and darkness, but in terms of bag numbers, there is no day other than the day so defined. The undertaking is to discharge 5,000 bags in each working day, but there is no undertaking to discharge 2,500 bags in half a working day.

Demurrage charges partake of the nature of penalties, and although they are more strictly speaking liquidated damages agreed to by the parties, the claim of demurrage none the less is based upon a default which cannot be declared unless in strictness it has taken place. The first working day which the consignees had, which could be called a 5,000-bag day, was Monday, February 5th, and hence the count of such working days against them begins with that day.

[4] (4) The final stand of the defense is that this charter party by its terms visits the liability to pay the demurrage upon the respondent only in case of its "default"; and it is averred that the respondent did not "default" in its obligation to unload, but was prevented from unloading by circumstances over which it had no control. Again, there is no need to discuss the question thus sought to be raised, because it has been flatly ruled against the respondent. The word "default," when used in charter party contracts, does not convey the idea of "fault," but the idea of mere failure to perform; and the lack of performance, if there is such lack, exists without regard to how it came about, subject, of course, to the vis major doctrine. Southern v. Unkel (D. C.) 236 Fed. 779; Burrill v. Crossman (D. C.) 65 Fed. 104; Id., 69 Fed. 747, 16 C. C. A. 381; and Crossman v. Burrill, 179 U. S. 106, 21 Sup. Ct. 38, 45 L. Ed. 106.

It adds nothing of value to the discussion, but an observation or two may be made respecting the position of the libelant. It is that the consignees were bound to discharge with the quick dispatch called for by the charter party, without regard to any time other than that called for by this degree of promptness and energy in the act of discharging. This we think is the correct view, but the parties have defined not only "days," but also "quick dispatch," in terms of bags, so that the discharge of 5,000 bags becomes the most definite, and because of this the accepted, measure of what is a "day," and also what is "quick dispatch."

We have thus, so far as concerns this court, indicated the disposition which should be made of all questions which were raised at the trial of the cause. We are now, however, handed a brief on behalf of the respondents, in which a number of new defensive positions are taken beyond those upon which the answer rests, and no suggestions of which were made during the trial or the oral argument at its close. At the expense of what would otherwise be an overlong opinion, these new points will be discussed, in order that the parties and their counsel may know that all features of the case, which they have thought worthy of being presented, have received consideration.

[5] One is an expansion of the position taken with respect to the leeway of "24 hours" after the arrival of the vessel before the work of discharging the cargo was required to begin. The amended view is that 24 hours means "a clear working day," which is further interpreted as meaning "11 working hours." In this way the respondents (disregarding their fractions) figure the work of discharging need not have begun before 2 p. m. Monday, February 5th, and (allowing 4 lay days and disregarding all other questions) the ship need not have been discharged before Friday, February 9th, at 1 p. m. This is because the vessel did not report until the evening (6:45 p. m.) of Friday, February 2d, and there were only 5 working hours on the succeeding Saturday and none on Sunday. If such a liberty in translating the "24 hours" phrase is allowed the respondents, we see nothing to restrain them from translating "24 hours" into the meaning of 24 "working hours," and thus postponing the running of lay days against them to 3 p. m. Wednesday, February 7th, as Monday was a holiday. This would expand the "24 hours" into practically 120 hours, and literally to 110 hours.

The contract says "24 hours," not "a day." We see, as before intimated, no more warrant for reading it "clear working day" than for reading it "clear working hours"—indeed, a less warrant. We think the charter party means what it says. Of course, it would necessarily mean that "lay days" would not begin until there was a lay day to begin after the expiration of the time limit, and if the time expired on a day which was not a lay day, the running of the lay days would begin with the then next lay day. There would be some plausibility in the argument which is implied in this that it allowed 24 hours of working time in which to prepare for the work of discharging. This would give for preparation the time up to practically Wednesday morning, February 7th, and relieve the respondents of the demurrage charge until noon Tuesday, February 13th (Monday being a holiday), or possibly to the 14th, thus reducing the claim to $5,250, or to $4,500. The Assyria, 98 Fed. 316, 39 C. C. A. 97.

The expression construed in the cited case was "one clear day," and the construction put upon it was moreover in accord with the proven custom of the port. We find no mandate in that case, nor in any proven port custom here, to construe "24 hours" to have any other meaning than that which the words, as ordinarily understood, carry.

[6] Another point which is made in the brief for the first time is that the respondents are relieved from the demurrage charge by the vis major principle. The principle itself must be accepted. Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106. The question is over the propriety of its application. It is asked to be applied here because of a custom house regulation under which the discharge of sugar may be prohibited under wet weather conditions. The fact is found that this authority was not exercised, nor was there occasion in the weather conditions, which affect this case, to enforce the regulations, nor did the regulation in any way cause the detention of the vessel, or affect the dispatch with which she was or might have been unloaded. The vis major doctrine has no application.

[7] The Assyria Case, supra, and Weir v. Northwestern (D. C.) 134 Fed. 991, are cited as authority to sustain the proposition that per diem demurrage is apportionable, and is properly allowed for fractions of a day. If this is the law, the effect of it is to increase the allowance which we have indicated as proper from $12,000 to $12,750. There is, however, absolutely nothing in the first-cited case to support the proposition for which it is quoted. On the contrary, the Court of Appeals' ruling supports that indicated as the proper ruling here. There there were 817,222 feet of lumber to be loaded, and 50,000 required to be loaded each day. The court allowed 17 lay days and 3 days' demurrage. There was, it is clear, no fractional lay day in this, and (although the exact hours are not indicated) the probabilities are the same observation is true of the demurrage allowance. In the Weir v. Northwestern Case, the ruling was based upon the custom of that port (Nome, Alaska), born of the peculiar conditions there prevailing. Even in that case the actual allowance was for six round days, and, if fractional days entered into the count, it does not appear otherwise than by the statement that days might be so counted.

There is this further observation to be made. Claims of demurrage may be made by way of damages for detention. In such cases (as we are figuring the actual damage), fractions of days may well be taken into account. Claims of demurrage may not be made on the basis of actual damages, but of a stipulated sum. The latter suggests, not a penalty, but something which partakes of the nature of a penalty. The sum to be paid for a day may be $1,500, but there is neither an agreement to pay $750, nor any such penalty incurred, for a half day.

[8] The further newly added thought of making out of the strike conditions the defense of vis major, on the authority of the West Hartlepool Case (D. C.) 151 Fed. 886, must fail of its purpose for lack of evidence to establish such a defense. There was no suggestion of such a thought when the case was tried. The defense then was the mere fact that the stevedores did not work, because they refused to work. The strike was merely their reason for not working. The respondents, it is true, offered to prove acts of actual violence. They accepted, however, and acted upon, the suggestion of the trial judge that such proofs would probably break down under the vigorous denials which were sure to be interposed. The point is that there was no proof of violence, and nothing therefore upon which to found an

application of the doctrine invoked. For aught that is known, the situation may have been this: The employer thought the work should have been done at a cost in wages of say $100. The men asked to do the work thought they should have $110. The doctrine then comes down to this: That the respondents ask to be relieved from the consequences of holding the vessel because they could not unload her for $100, although they might have unloaded her had they been willing to pay $110. There is no vis major to be found in the facts of this case as proven.

[9] The stress of the whole case seems now further to be placed upon the fact that the libel is based upon the charter party, which evidences the contract between the ship and the charterer, and the further fact that the respondents are indorsees of the bill of lading, having bought the cargo in transitu. If any point was made of this at the trial, it wholly escaped the attention of the trial judge. The evidential facts underlying the proposition now advanced are these:

There was first the charter party (known as the Anderson-Atkins) dated October 26, 1916. This chartered the whole ship for the voyage afterwards made to carry the cargo which afterwards was carried. It provides for demurrage as now claimed. It provided for the signing of bills of lading "without prejudice to this charter." There was a cesser clause, relieving charterers of liability after vessel was loaded and bills of lading signed, reserving, however, "absolute lien on cargo for freight, dead freight, and demurrage." The cargo was loaded and bills of lading signed.

One was dated January 21, 1917, for 4,400 of the bags of sugar which formed the cargo, and names Czarnikow, Rionda Company, or assigns, as consignees. It provides that:

"This bill of lading is subject to all provisions of the charter party or freight contract dated [blank] under which this shipment is made, and is without prejudice thereto."

Clause 8 provides that the carrier shall have a lien on the goods for "all freights, primages, demurrage, and other charges * * * and also for all other sums for which shipper, owner, or consignee may be liable to carrier under this bill of lading and/or under any charter party or freight contract under which this shipment is made." The final provision is that the shipper, owner, consignee, or holder shall be bound by every provision in the bill of lading which was signed by the master. The other bill of lading covers 15,000 bags of the same cargo (the two thus covering the full cargo). It is also dated January 21, 1917, and is the same as the other, and also signed by the master. The respondents are the indorsees of both of these bills of lading. There was also another charter party, entered into between Atkins & Co. and the Munson Steamship Line, dated January 4, 1917, for the whole ship. It provides for the same $1,500 per diem demurrage. Clause 5 calls for bills of lading "to be signed without prejudice to this charter and subject to this contract as to * * * demurrage." Clause 12 gives to ship "an absolute lien on cargo for * * * demurrage."

It is not a little difficult to grasp the thought which is intended to be presented by respondents' argument in view of these facts. The starting point of the argument would seem to be the fact that there were two charter parties; one between the ship and Atkins, the original charterer, and the other between the charterer and the Munson Line, who were the actual shippers. So far as the demurrage feature and a right of lien therefor are affected, the contracts are the same. The distinction between the two contracts must therefore apparently be the very narrow one that the libelant has brought its action upon the wrong contract. This is the equivalent of saying to the libelant there are two contracts, each giving you the same right of action, but you have sued upon the wrong one. Even if, in the strict sense, this were true, we think the respondents are too late in raising the question.

We are unable, however, to subscribe to the soundness of the proposition. This action is by the owners of the ship upon the contract made with them. If it were founded upon the Munson contract, the right of action would be in the charterer. We see no difference in respect to contractual liability between a contract affecting a ship and one affecting other property. The owner of a house may lease it without restrictions. The tenant may sublet it (as if he were the owner) to another tenant. If the owner asserts his right of action, it must be based upon the agreement made with him. If he asserts it against his lessee, the contract measures the liability of the defendant. If he asserts it against the subtenant, who is not a party to this contract, the liability of the defendant may or may not be so measured. This fact may introduce other questions.

Respecting the point before us, however, the rights of the plaintiff would be properly based on his contract, although it might be true that his rights as against his lessee had been modified as against the subtenant. This objection to the right of the libelants to maintain their libel is not sustained.

The other point sought to be made is more readily grasped. The right to recharter a chartered vessel must be conceded, because the charterer is pro hac vice the owner. It must be clear, however, that nothing the charterer does can affect ipso facto the rights of the owners. Whatever change is wrought must be because of something done by them, or arise out of the relations between them and the consignees. After a cargo has been taken aboard and a bill of lading is signed, the consignee may assign it, and the indorsee acquires certain rights which, of course, he can assert. Along with these rights he assumes certain obligations, or at least his rights are qualified by those of the carrier. As between the carrier and an indorsee of the bill of lading, the measure of their respective rights may differ from that which is applied in controversies between the carrier and charterer. A carrier, who signed a bill of lading by which he agreed to deliver to any indorsee of the bill without, for instance, the payment of freight or demurrage, could not assert a right to either against such indorsee or the cargo, although his claim against the charterer would remain good. Moreover, the agreement in such bill that the cargo should remain liable to the carrier for demurrage would not be construed as an admission of

liability to a demurrage claim which arose, not out of any fault of the consignee, but wholly out of an agreement between the carrier and another, unless the consignee had so agreed, expressly or impliedly. All this is based upon familiar principles. The true basis of liability is frequently controlled by the circumstance of whether the proceeding in which it is sought to be enforced is in rem or in personam, a distinction which the respondents seem to have ignored. The present proceeding is one in rem, and the libelants, of course, cannot assert against the cargo any rights other than those which they have against the rem, or against it as answerable for the undertakings of its owners. A lien may, however, be asserted against the rem for a claim for which its owners would not be liable in personam.

We see no occasion to pursue this subject further, or to determine questions which might have been raised. Here again the respondents are too late in raising some of the questions which are discussed in the brief. They might have raised the one of their liability for the demurrage stipulated by the conventions of the charter party. They, however, admitted it, and sought to show that the agreement had been met, or that they were excused from performance by the facts they sought to prove. To permit them now to introduce this new defense would do an injustice to the libelants, which cannot be permitted.

A decree in favor of the libelants and against the respondents for the payment of the sum of $12,000, with interest thereon from February 16, 1917, together with costs, may be submitted.