### WEIR et al. v. NORTHWESTERN COMMERCIAL CO.

(District Court, D. Washington, N. D. January 28, 1905.)

#### No. 2,581.

SHIPPING—DEMURRAGE—DISCHARGE ACCORDING TO CUSTOM OF PORT OF NOME.

    A charter for the carriage of a cargo of coal to Nome, Alaska, provided that the cargo should be discharged by the ship and received by the charterer at the rate of 500 tons "per weather working day. * * * Ship to discharge according to custom of port." It is the custom at the port of Nome, owing to the lack of any harbor, to discharge vessels at all hours of the day and night, and 24 hours constitute a day's work; any portion of time worked less than that counting as a fraction of a day. Neither the ship nor the charterer was capable of handling 500 tons of coal in less than a day of 24 hours. Held, that such custom of the port governed in computing demurrage, and 24 hours, day or night, during which the weather was such that the work could safely proceed, constituted a "weather working day," within the meaning of the charter; any less number of hours worked being counted as a fraction of a day.

    [Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 576–582.

    Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

In Admiralty. Suit to recover demurrage for detention of ship at Nome, Alaska, caused by failure of consignee to expedite discharge of cargo according to agreement contained in charter party. Heard on the merits. Decree for libelant.

On the 7th day of July, 1903, libelants chartered to respondent the steamer Wyneric for the carriage of a cargo of coal from Nanaimo, British Columbia, to Nome, Alaska. The particular clauses of the charter party which are material in this case are as follows:

"Seattle, Wash., July 7th, 1903.

"This charter party this day made and concluded upon between James Laidlaw & Co. of Portland, Ore., agents for owners of the steamship 'Wyneric' of the measurement of 3,264 tons register, or thereabouts, now at Port Town-

send, of the first part, and the Northwestern Commercial Co. of Seattle, of the second part.

"Witnesseth, That the said vessel being tight, staunch, strong, and every way fitted and provided for the voyage shall proceed to Nanaimo, B. C., and there receive on board, where she may safely lie, always afloat, a minimum quantity of 4,000 tons (of 2,240 lbs.) of sacked coal and being so loaded shall therewith proceed to Nome, Alaska, or so near thereunto as she may safely get, and there deliver the same, being paid freight on the same at the rate of $4.75 per ton of 2,240 lbs. taken aboard. * * *

"Cargo to be delivered at ship's tackle.

"Owners agree to discharge and charterers agree to receive cargo at the rate of 500 tons (2,240 lbs.) per weather working day, Sundays and holidays excepted, such time to count from receipt of notice of readiness to discharge from Master. Ship to discharge according to custom of port. * * *

"Demurrage, if any, incurred in loading and/or discharging to be at the rate of three pence per gross register ton per day.

"Ship to have a lien on the cargo for all freight, demurrage and all other legal charges.

"The Act of God, perils of seas or other navigable waters, barratry of the master and crew, enemies, pirates, civil commotions, robbers, thieves, arrest or restraint of princes, rulers or people, riots, strikes, or stoppage of labor, capture or seizure, or arrest under civil process mutually excepted."

Thereafter, and with reasonable dispatch, the vessel proceeded to Nanaimo, British Columbia, where it took on a cargo of 4,800 tons of coal, and arrived at Nome on the 8th day of August, 1903. The delivery of said cargo to the lighters of respondent was completed on the 5th day of September, 1903, at 12:30 p. m.; and libelants claim that the vessel was detained 12 days beyond the time allotted under the terms of the charter, and that the respondent therefore owes them demurrage at the rate of $303.25 per day, being a total of $3,639, with interest thereon as said demurrage accrued.

The principal controversy in this case relates to the true construction of the clause of the charter party which, in effect, provides that the delivery of the cargo should be made at the rate of 500 tons per weather working day, Sundays and holidays excepted, according to the custom of the port; libelants claiming that a weather working day was 12 hours, and respondents claiming 24 hours as a weather working day, according to the custom of the port at Nome. Respondents also claim that they should not be charged for the time that they were prevented from operating their lighters owing to a strike among their employés, and libelants contend that this strike was not general, and therefore respondents should not be allowed this time.

There was some conflict as to the condition of the weather at the ship and at the shore; the ship's log showing favorable weather for unloading at times when, according to the record kept on shore, the sea was too rough for lighters to venture out.

The following facts were established by the evidence: There is no harbor at Nome, and ships anchor in Behring Sea about two miles from the shore, and cargoes must be discharged into lighters, which are then taken to shore and unloaded upon the beach. The shore is bleak, barren, and covered with sand, and storms often arise on very short notice; making it impossible to transfer freight from the vessels to lighters, or to land it on the shore. The sea is shallow, and, because thereof, becomes rough and dangerous in a very short time after a storm arises. The water may be smooth near the shore, and yet too rough where the vessel is anchored to safely place cargo upon the lighters or have them lie alongside; and sometimes, when there is only a moderate sea at the vessel, caused by the wind blowing towards the shore, there may be a surf on shore, so that it will be impossible to safely land cargo from the lighters. From the time of the commencement of business at Nome, which was in 1889, it has been the custom to work at all hours of the day and night in unloading vessels, when the sea would permit, and 24 hours constitutes a day's work; and, if discharge is carried on for only a portion of the 24 hours, it is, according to the custom of the port, figured as a fraction of a day. Neither respondent nor libelant had the capacity to handle 500 tons per day, as required by the charter, in less than a day of 24 hours.

Upon leaving Nanaimo the agents of the vessel's owners instructed the master to make all preparation to discharge day and night, according to the custom of the port.

Williams, Wood & Linthicum, for libelants.
John P. Hartman, for respondent.

HANFORD, District Judge (after stating the facts). By the terms of the charter party the libelants were obligated to carry a cargo of coal to Nome, and discharge it there according to the custom of the port, and the conditions there make it necessary to work during all of the 24 hours of each day, when practicable. From necessity, it is the practice there to work at all hours when possible. This was understood by the parties to the contract when it was made, and the libelants' agent instructed the captain of the Wyneric to employ a sufficient number of men to discharge cargo at all hours required by the consignee. The charter party also required the ship to deliver the cargo at the rate of 500 tons each "weather working day," except Sundays and holidays, and required the consignee to receive the same at the ship's tackle; and I find that neither party had capacity to handle that amount of coal in less than a day of 24 hours. The charter party also provides for demurrage, at a specified rate, to be paid by the charterer, for each calendar day, in case of detention of the ship by the charterer after the expiration of the time required to discharge the cargo at the rate of 500 tons per weather working day.

I find from the evidence that during the time the vessel was discharging there were days on which cargo was discharged, when, by change of weather and conditions of the sea, it was impossible to work continuously during all of the 24 hours; and it is my opinion that it will be unfair, and not in accordance with a reasonable construction of the contract, to hold either that such days should be entirely omitted from the count, or credited to the ship as full weather working days, and, considering all the provisions of the contract, and the facts proved as to conditions prevailing and the custom of the port, each of such days should be estimated as a fractional day.

The steamer arrived at Nome on Saturday, the 8th day of August, 1903, and commenced discharging cargo on Sunday, the 9th, and finally completed full delivery on Saturday, September 5th, during which time there were interruptions by wind and waves and surf rolling on the beach, and a strike of the respondent's employés, which continued three days, so as to impede the work of receiving cargo, although it did not cause a total suspension of work. The ship delivered coal to the lighters furnished by the respondent during the hours of the night and on Sundays, when the weather permitted, to the extent of the capacity of the crew. But there was no continuous delivery of cargo during the 24 hours of any day, and on some occasions the crew stopped work at night when lighters were waiting, for the reason that the men had worked their full time, and the libelants failed to fully live up to their contract by employing a sufficient number of men for relief shifts. The evidence also shows that time was lost by failure of the respondent to furnish lighters to receive coal at times when the ship was ready to make delivery.

134 F.—63

I consider that, upon a fair estimate, making due allowance for interruptions of work by stress of weather and the strike, and failure of the libelants to continuously deliver when lighters were waiting and the weather was favorable, and giving credit for work done on Sundays and on stormy days, when either party might have refused to work, as a set-off for time lost by failure of one party or the other to continue the work at times when the weather permitted, the respondent was in fault, causing detention of the ship six days beyond the time allowed for discharging and receiving the cargo, by the terms of the charter party, construed as I have construed it, allowing 24 hours in workable weather for a "weather working day"; and I direct that a decree be entered in favor of the libelants for the amount of six days' demurrage at the rate specified in the contract, with interest from November 11, 1903, and costs.