## MAZZA v. J. G. WHITE ENGINEERING CO.

## STATHATOS & CO., Limited, v. INTERNATIONAL FREIGHTING CORPORATION.

(District Court, S. D. New York. June 16, 1921.)

1. **Shipping ⚙═⟶52—Agent making charter for undisclosed principal liable as charterer.**
   In a suit by an owner for breach of charter, it is no defense that in making the charter respondent acted as agent, where such fact and the name of the principal were not disclosed.

2. **Shipping ⚙═⟶39—Construction of special provision of charter party.**
   Where, in a charter party prepared by the English agents of the owner, though made and to be performed in the United States, the parties have inserted a special provision which is for the benefit of the charterer, so that the contract in fact falls within an English decision, in interpreting the change that decision becomes a particularly persuasive authority.

3. **Shipping ⚙═⟶45—Charterer held excused from delays in loading from any cause in fact beyond its control.**
   A provision of a charter party excepting from lay days for loading time lost through "any cause beyond the control of the charterers, whatsoever," *held* to excuse any delay caused in fact by circumstances which the charterer could not control, but to a similar charter party in which the word "whatsoever" is omitted the rule ejusdem generis applies.

4. **Shipping ⚙═⟶39—Exceptions in charter party construed as mutual.**
   Exceptions in a clause of a charter party containing mutual agreements by owner and charterer construed as being themselves mutual, though not so designated.

5. **Shipping ⚙═⟶39—Exception in charter party of restraints of rulers held to cover transportation of coal cargo from mines to port of loading.**
   Exception in a charter party of restraints of rulers *held* to cover transportation of coal, which was to constitute the cargo, from mines to port, where it was known to both parties that the practice at the port of loading was not to store coal in quantity, but to load direct from cars from the mines, and to excuse the charterer for failure to load within the time prescribed, where it was caused by an order of the Interstate Commerce Commission establishing priorities and preferences.

In Admiralty. Suits by Edward Mazza against the J. G. White Engineering Company, and by Stathatos & Co., Limited, against the International Freighting Corporation, and four other cases. On exceptions by libelants to two articles of answers. Sustained in part.

The case arises on the libelant's exceptions to two articles (tenth and eleventh) of the answer for insufficiency.

⚙═⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The libel was filed by the owner for damages arising for a breach of the charter party under which the respondent chartered a steamer for a voyage from Baltimore to Genoa with a cargo of coal. The material part of the charter party for the purposes of the case are clauses 3 and 7, which read as follows:

"3. The cargo to be loaded with customary despatch but at not less than 1,500 tons per running day, Sundays and legal holidays excepted, lay days commencing, * * * steamer being completely discharged of inward cargo and ballast in all her holds and ready to load, such notice to be given between business hours, 9 a. m. to 5 p. m., or 1 p. m. on Saturdays. * * * Any time lost through riots, strikes, lockouts, or any disputes between masters and men occasioning a stoppage of pitmen, trimmers, or other hands connected with the working or delivery of the coal for which the steamer is stemmed; or by reason of accidents to mines or machinery, obstructions on the railway or in the docks; or by reason of floods, frost, fogs, storms or any cause beyond the control of the charterers, whatsoever, not to be computed as part of the loading time (unless any cargo be actually loaded during such time). In the event of any stoppage or stoppages arising from any of these causes continuing for the period of six runing days from the time of the vessel being ready to load, this charter shall become null and void, provided, however that no cargo shall have been shipped on board the steamer previous to such stoppage or stoppages. In case of partial holiday or partial stoppage of colliery or collieries from any or either of the aforementioned causes, the lay hours to be extended proportionately to the diminution of output arising from such partial holiday or stoppage. * * * "

"7. The act of God, the king's enemies, restraints of princes and rulers, and perils of the seas excepted. Also fire, barratry of the master and crew, pirates, collisions, strandings, and accidents of navigation, or latent defects in, or accidents to hull and/or machinery, and/or boilers, always excepted, even when occasioned by negligence, default, or error in judgment of the pilot, master, mariners, or other persons employed by the shipowner, or for whose acts he is responsible, not resulting, however, in any case, from want of due diligence by the owner of the ship, or by the ship's husband or manager. Charterers not answerable for any negligence, default or error in judgment of trimmers or stevedores employed in loading or discharging the cargo. The steamer has liberty to call at any ports in any order, to sail without pilots, to tow and assist vessels in distress and to deviate for the purpose of saving life or property, and to bunker. It is also mutually agreed that this shipment is subject to all the terms and provisions of and all the exemptions from liability contained in the act of Congress of the United States, approved on the 13th day of February, 1893, and entitled 'An act relating to Navigation of Vessels,' etc." Comp. St. §§ 8029–8035.

The libelant alleges readiness and tender of the vessel and the respondent's failure to furnish a cargo.

The tenth article of the answer alleges that the respondent was acting as agent for Société Co-operative Suisse de Charbons, of Basle, Switzerland, on whose behalf the charter party was made, as appeared from the approval signed by one Rohner, Chief of the Official Purchasing Office of the Legation of Switzerland.

The eleventh article is too long to set out in extenso; in substance it is as follows: That at the time in question no coal was stored at any of the loading ports named in the charter party, but it was all transported in freight cars always direct to the vessels into which it was dumped, as was well known to the libelants. That strikes and labor troubles arose before July 9, when the vessel was tendered, which greatly impeded the transportation and delivery of coal. That by reason of the situation so arising the Interstate Commerce Commission declared an emergency to exist, and established by valid orders priorities, preferences, and conditions in the shipment of coal. That all carriers obeyed these orders, and that the respondent by reason of their provisions was unable to obtain a cargo, although it made diligent efforts to do so. That the condition so arising continued for six running days, at the end whereof the respondent denounced the charter party as entitled to do.

992                    274 FEDERAL REPORTER

Charles R. Hickox, of New York City, for exceptant.
Roscoe H. Hupper, of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). [1] The mere fact that the charter party was approved by the purchasing officer of the Swiss legation did not make the contract one with the Swiss Coal Company. The only charterer named was the respondent, and even though the Swiss Company was in fact an undisclosed principal, it is nothing to the purpose. To escape liability the agent must disclose the identity of the undisclosed principal. Horan v. Hughes (D. C.) 129 Fed. 248, affirmed 129 Fed. 1005, 64 C. C. A. 581 (C. C. A. 2d). Here there was no declaration, in the document or outside, of the identity of the principal. All that appeared was that the Swiss Republic approved, and the most that that might signify was that they had some interest in the contract. It now transpires that a Swiss corporation, prima facie at least quite independent of the Swiss Republic, was the principal. There was no intimation, even, of that, and I can see no ground for the defense. The exception to the tenth article is sustained.

I shall assume that the scope of the eleventh article is that the orders of the Interstate Commerce Commission absolutely prevented the respondent from obtaining a cargo for the ship. It is clear that the pleader does not mean to aver that it was so prevented by the strikes and labor troubles alone. The pleading at least on exception must be taken to mean that the labor troubles caused so much delay and dislocation of transportation that the Interstate Commerce Commission found it necessary to intervene, and that its intervention proved a fatal obstacle to the respondent's performance. The excuse is therefore necessarily based either upon the frustration of the venture by an event so unexpected as to amount to excuse, or upon a situation which was within the exceptions of the charter party (clauses nos. 3 and 7).

[2] In Larson v. Sylvester, [1908] A. C. 295, the House of Lords held that a clause which read "hindrances of what kind soever" should not be construed under the usual rule, ejusdem generis, but enabled the charterer to take advantage of any cause which in fact prevented his performance. It must be owned that the distinction is verbal and narrow, but the law has been so in England since 1908. It is extremely probable that the word "whatsoever," which was written into the printed form, was added to fall within the doctrine of that case; at least it is a strange coincidence if it be not so. Moreover, the charter party was prepared on a form of the owner's agents, and it is fair to assume against them that in so preparing it, and inserting in writing the word in question, they meant to give the charterer the benefit of that rule. The agents are the well-known English house of Furness, Withy & Co., Limited, and they presumably dealt with the English law in mind. Of course, I do not mean that the interpretation of a writing made in this country and to be performed here, as respects loading, is as matter of law to be interpreted in accordance with the law of England unless the parties so agree, which they have not done. All I

mean is that where they have especially conformed their contracts so as in fact to fall within an English decision, in the interpretation of the change (made as this was for the charterer's benefit), that decision becomes a particularly persuasive authority.

England being the greatest maritime nation, we have always accorded much weight to the decisions of its highest courts in all matters maritime. I should be disposed, I think, to yield to the authority of that court, even though I might be in considerable doubt. However, it does not seem to me that there is really any room for doubt in the case at bar, even without the authority in question. What must be the inevitable conclusion from the conduct of an owner who had before him a printed form which limited the charterer's excuses to matters ejusdem generis with riots, strikes, accidents, and railway obstructions, and who expressly inserted the word "whatsoever," which was not necessary to the clause as it stood, and which could therefore have no meaning except make the excuses general? I can imagine that if the word had occurred in the printed form it might be treated merely as scrivener's tautology, but the deliberate insertion of it in writing necessarily presupposes a purpose to extend the charterer's rights.

[3] Therefore I conclude that the clause, "any cause beyond the control of the charterers whatsoever," excused any delay caused in fact by circumstances which the charterer could not control, and I overrule the exception to the eleventh article in those cases in which the word "whatsoever" appears.

In one of the cases, however, it does not appear, and the case stands with the rule ejusdem generis applicable to clause 3 of the charter party. I have just considered this question at perhaps too great length in The Poznan, 275 Fed. ——, filed July 9, 1921, and it will be unnecessary to discuss it again. The only distinction between that case and this is that if I am to find a "genus" or single "category" within which under Lord Justice Farwell's doctrine all the enumerated excuses must be comprised, it would be more difficult to do so than in the bill of lading of the Poznan, and perhaps it would be impossible. That doctrine, as I there said, does not appear to me to be based upon the authorities. I recognize its logical perfection, but that seems to me its very imperfection when applied to everyday affairs. I do not believe that men mean anything so definite and conclusive when they draw up documents of this character. The doctrine has been disapproved several times in England since it was announced, and with the greatest deference, I cannot believe that it is the law there, or should be the law here. Therefore I hold that clause 3 does not excuse the charterer in the libel of the owners of the steamship Morte.

[4] The exceptions in the seventh clause are divided into two sentences and not run together as is usual. Neither of the sentences contains the words "mutually excepted," and the question is whether they are to be so interpreted, or are to be taken to protect only the shipowner. On authority this question seems to be in considerable doubt. I have been referred to no American cases which throw any light upon it. In Hughes v. Hoskins (D. C.) 136 Fed. 436, and M. O. H. of

West Indies v. Hannevig (C. C. A.) 264 Fed. 311, the exception was mutual in terms. In McLeod v. 1,600 Tons of Soda (D. C.) 55 Fed. 528, although it was not in form mutual, the context showed that that was unquestionably so intended.

In England the case seems first to have come up before Lord Kenyon, in 1801, in Blight v. Page, 3 B. & P. 295, note, in a case where the exceptions were directly adjacent to the owner's covenants, and was ruled against the charterer. Lord Alvanley, in Touteng v. Hubbard, 3 B. & P. 292, made the same ruling obiter, and there were actual decisions to the the same effect in Sjoerds v. Luscombe, 16 East, 201, and Storer v. Gordon, 3 M. & S. 309. In Ford v. Cotesworth, L. R. 5 Q. B. 544, the charterer was excused on the ground that the discharge was prevented by vis major, but Mr. Baron Martin, at page 548, declared that he regarded the exceptions as mutual in any event. In Barrie v. Peruvian Corporation, 2 Com. Cas. 50, Mr. Justice Mathew examined the whole clause in which the exceptions were contained, and because it began and ended with mutual provisions, held that the exceptions were also to be considered as mutual. Mr. Justice Bigham, who had been counsel for the owners in Barrie v. Peruvian Corporation, supra, followed that case, though against his judgment, in Newman, etc., Co. v. British, etc., Co. (1903) 1 K. B. 262, and Mr. Justice Scrutton did the same thing in Embiricos v. Sydney Reid Co., 19 Com. Cas. 263. On the other hand, Mr. Justice Greer, in Aktieselskabet Frank v. Namaqua, etc., Co., 25 Com. Cas. 212, reached a different result in a case where the only exceptions were in the second of three clauses. The first clause concerned the charterer's loading, and the third his discharge; but the second contained nothing which could be deemed mutual, unless it were the exceptions. In this respect it differed from Barrie v. Peruvian Corporation, supra. In Cazalet v. Morris (1916) Session Cases, 952, the Scotch Court of Session, after a full discussion, declined to follow Barrie v. Peruvian Corporation, supra; but in that case it did not appear that any part of the clause in which the exceptions occurred was mutual. Mr. Carver, section 150, seems to understand that if the exceptions are only annexed to the shipowner's covenants, he alone is to have the benefit of them, but if they follow several clauses which relate to the obligations of both parties, they are to be construed mutually.

In the case at bar the probable intention of separating the exceptions in clause 7 into two sentences was to distinguish between such events as might be due to the crew's negligence and such as could not, though it must be admitted that this division is not altogether accurate. I think it hardly probable that there was a deliberate purpose to make the first exceptions mutual, since it would have been quite easy to include the word "mutual," had that been so intended. However, the clause as a whole contains a sentence expressly in the charterer's favor, and the provision for the Harter Act at the end begins with the words, "it is also mutually agreed." In such documents I think that any attempt by refined analysis to piece together a consistent meaning is apt to prove delusive; the interpretation must be cruder, because the intent is

somewhat vague. While I recognize that the occurrence of the word "mutually," in the last sentence, and its omission from the first sentence, is an argument in favor of the owner, on the other hand, it must be observed that a mere emphasis on the word "also" would be an answer to that argument. On the whole, I think it safer to adopt the canon of interpretation of the English courts; that is, to limit the rule that the exceptions favor only the owner to those cases where they are either annexed specifically to the owner's obligations (in which case there is no doubt), or—as in Aktieselskabet Frank v. Namaqua, etc., Co., supra, —where they occur in a clause which contains no provisions touching the charterer, and where all his rights and duties are therefore to be found in entirely different clauses. As the exceptions in this case occur in a clause which contains mutual agreements, I construe them as being themselves mutual.

It is therefore unnecessary to consider whether independently of the exception the charterer would be excused under the doctrine of vis major. Ford v. Cotesworth, supra; M. O. H. of West Indies v. Hannevig, supra.

In Stathatos et al. v. International Freighting Corporation, the exception was mutual and the point does not arise.

[5] The only remaining question in all the suits is whether the matter alleged protects the respondents, that is, whether the exception covers the restraint of rulers over transportation from the mine to the port. It is alleged that it was known to both parties that the practice at the ports in question was not to store coal in quantity, but to carry each shipment direct from the mines and to dump it on board from the cars. In analogous cases it has been held that any interruption of transportation between such a place of storage and the ship is within the exception. Hudson v. Ede, L. R. 3 Q. B. 412; Smith et al. v. Rosario, etc., Ltd., (1893) 2 Q. B. D. 323; Allerton v. Falk, 6 Asp. 287. Indeed, under clause 3 the matter is not even open to argument. Under clause 7, it is perhaps debatable, but I shall follow the English cases.

I do not find anything in Judge Rose's opinion in Hellenic, etc., Co. v. Archibald McNeil & Co., Inc. (D. C.) 273 Fed. 290, which conflicts with what I have said. He did not determine any of the questions raised by the pleadings here, but was passing on the facts. It does not, of course, follow that the respondents can make good their defenses any more than they did before Judge Rose, but if they show an absolute prevention from loading any cargo, owing to the orders of the Interstate Commerce Commission, I think they are excused from performance.

The exceptions are therefore overruled to the eleventh article of the answers in the first five suits and sustained as to the tenth article. The exception to the fourteenth article of the answer in the Stathatos libel is overruled.