## THE LAKE YELVERTON.

## F. S. ROYSTER GUANO CO. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. June 14, 1924.)

No. 2128.

1. **Shipping ⬉181—Charter; lay days held to commence on giving of notice by master of readiness to load or discharge, though not in berth.**

Under a provision of a charter party that lay days should commence to run "from the time the captain reports himself ready to receive and discharge cargo," construed together with other provisions, lay days *held* to run from the time the captain gave notice of presence at the port and readiness to load or discharge, and not from the time he reached a berth.

2. **Shipping ⬉171—Charter; mutual exception clause held not to apply to delay from occupation of berths by other ships.**

Mutual exception in a charter party of "act of God, restraint of princes and rulers, * * * and all and every other unavoidable hindrances which may prevent the loading and delivery," *held* not to apply to hindrance caused by occupation of berths by other ships ahead.

3. **Shipping ⬉181—Charter; in computing demurrage, fraction of day to be counted as whole day.**

Where the provisions of a charter party for lay days and demurrage speak in terms of days in computing demurrage a fraction of a day is to be counted as a whole day.

Rose, Circuit Judge, dissenting.

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Laurence Groner, Judge.

Suit in admiralty by the United States, owner of the steamship Lake Yelverton, against the F. S. Royster Guano Company. Decree for libelant, from which both parties appeal. Modified.

For opinion below, see 288 Fed. 92.

Cadwallader J. Collins, of Norfolk, Va., for appellant and cross-appellee.

H. H. Rumble, Sp. Asst. in Admiralty to U. S. Atty., of Norfolk, Va. (Paul W. Kear, U. S. Atty., of Norfolk, Va., Arthur M. Boal, Asst. Admiralty Counsel, of Boston, Mass., and Harold F. Birnbaum, of Brighton, Mass., on the brief), for appellee and cross-appellant.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

WOODS, Circuit Judge. On September 14, 1920, F. S. Royster Guano Company chartered the United States Shipping Board steamship Lake Yelverton, then at Key West, Fla., to carry a cargo of phosphate rock from Port Tampa, Fla., to Baltimore, Md. The charter contained these provisions:

Section 4: "The act of God, restraint of princes and rulers, the steamer's enemies, fire and all and every other dangers and accidents of the seas, rivers and steam navigation of what nature and kind soever, and all and every other unavoidable hindrances which may prevent the loading and delivery during the said voyage, always mutually excepted."

Section 6: "It is agreed that the lay days for loading and discharging shall be as follows, commencing from the time the captain reports himself ready

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to receive or discharge cargo five weather working days inclusive for loading and discharging, Sundays and legal holidays excepted."

Section 7: "Also for each and every day's detention by default of said party of the second part, or agent, $1,000 United States gold ton per day, day by day, shall be paid by said party of the second part, or agent, to the said party of the first part, or agent."

Section 13: "Lay days if required by charterers not to commence before September 15, 1920, and should the steamer not be ready for cargo at her loading port' on or before September 25, 1920, the charterers or their agents have the option of canceling this charter party at any time not later than the day of steamer's readiness."

Section 15: "Steamer to haul to a customary loading berth, and at port of discharge to proceed to such anchorage or safe dock to discharge cargo as ordered to consignees, steamer, however, to lie always afloat, and any anchorage necessary to enable her to reach discharging place to be at the risk and expense of cargo."

The vessel arrived at Port Tampa at 1 p. m., September 15, 1920, was entered at the custom house, and at 2 p. m. on that day the master reported that she was ready to receive cargo. At that time she was lying in the stream waiting to be assigned a berth.

There were two berths at Port Tampa for the loading of phosphate rock, both owned and controlled by the Atlantic Coast Line Railroad Company. The general agent of that company directed the berthing of all vessels. His custom was to assign ships to berths in the order of their respective arrivals and registration, and this order was followed by him in respect to the Lake Yelverton. Port Tampa had no facilities for storing phosphate rock, and vessels were loaded directly from cars as they came from the mines. Hence there was no cargo ready for the vessel.

When the master of the Lake Yelverton reported himself ready, there were five vessels ahead loading or waiting to be loaded. At 9 p. m., September 18, 1920, the Lake Yelverton was assigned a berth. Loading was commenced at 9:20 p. m. and completed at 5:30 p. m., September 19. The Lake Yelverton arrived at Baltimore and was reported ready to discharge at 12:40 p. m., September 27. Discharge was completed at 5 p. m. September 29.

The steamship was in Port Tampa 4 days, 3 hours, and 30 minutes from the time the master reported himself ready to receive cargo. The actual time consumed in loading was 20 hours and 25 minutes. Deducting 17 hours and 30 minutes for Sunday work, as provided by the charter party, the vessel was in port 3 days and 10 hours from the time the master reported, but was actually engaged in receiving cargo only 2 hours and 55 minutes; 2 days, 4 hours, and 20 minutes were consumed in discharging the cargo at Baltimore. The ship was in the two ports 5 days, 14 hours, and 20 minutes, after allowing deduction for Sunday work; whereas, the actual time consumed in loading and discharging was only 2 days, 7 hours, and 15 minutes.

In its libel, the United States, owner of the vessel, claimed a full day's demurrage for 14 hours and 20 minutes over the 5 lay days provided by the sixth article of the charter. The District Court held that the lay days began to run against the charterer when the master arrived in Port Tampa harbor and reported himself ready to load; that to the lay days should be added in favor of the charterer the time it

would take the vessel to reach the wharf after notice of her readiness; and on this basis allowed demurrage to the ship for a half day.

[1] The main question made by the appeal is: Did the words of the charter, that the lay days should commence to run "from the time the captain reports himself ready to receive and discharge cargo," mean that the captain could start the running of the 5 days by giving notice of readiness on arrival in the harbor, or only after he had reached a berth? It is strange that at this day such a question should arise in the construction of obscure provisions of a charter party, when the matter could be placed beyond all doubt by a simple standard provision. If the question depended on the construction of sections 6 and 15, the point would be one of difficulty. In the cases where such a question has arisen between the owner and the charterer, hardly any two charters have been the same. Even where they seem practically the same, the courts are in disagreement. Varying judicial views will be evident from the examination of the American and English cases cited in the margin [1]

In this case, however, doubt as to the meaning of the words used in the sixth clause, "ready to receive cargo," seems to be removed when we consider the meaning of the same words in section 13 of the charter. That section provides that lay days shall not commence before September 15. The charter was signed on September 14. At that time there were several vessels to be loaded at the docks before the Lake Yelverton could get a berth, and it would have been senseless to provide against the vessel being ready at the dock before the 15th, when it was known to be impossible for her to be at the dock on that day. Section 13 provides that the charterer was to have the option to cancel the charter at any time not later than the day of the steamer's "readiness." If readiness here means readiness at the dock, the steamer might have been compelled to wait for weeks in the harbor ready to go to a dock, and after delaying all this time the charterer could still cancel the charter on the very day that she reached the docks. A meaning of "readiness" so unreasonable must be rejected. It is important to observe also that section 13 provides for cancellation should the steamer not be ready for cargo "at her loading port." Thus it appears that the readiness contracted for by the steamer was readiness at the port and not at the berth. The plain meaning was

---

[1] Empire Transportation Co. v. Philadelphia R. R. Co., 77 Fed. 919, 23 C. C. A. 564, 35 L. R. A. 623; Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 406, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126; Anderson v. Moore, 179 Fed. 68, 102 C. C. A. 362; Tweedie Co. v. Pitch Pine Co. (D. C.) 156 Fed. 88; Moody v. 500,000 Laths (D. C.) 2 Fed 607; O'Rourke v. 220 Tons of Coal (D. C.) 1 Fed. 620; Wasson v. Stetson Co. (D. C.) 214 Fed. 329; The Stotesbury, 187 Fed. 111, 109 C. C. A. 31; Swan v. Wiley, 161 Fed. 905, 88 C. C. A. 510; Williams v. Theobald (D. C.) 15 Fed. 465; Bjorkquist v. Certain Steel Rails (D. C.) 3 Fed. 717; Flood v. Crowell, 92 Fed. 402, 34 C. C A. 415; Armement Adolph Deppe v. John Robinson Co., Ltd., [1917] 2 K. B. 204; Jones, Ltd., v. Green Co., [1904] 2 K. B 275; Sanders v. Jenkins, [1897] 1 Q. B. D. 93; Arden Steamship Co. v Weir & Company, [1905] 1 App. Cas. 501; Good v. Isaacs, [1892] 2 Q. B. D. 555; Little v Stevenson & Co., [1896] 1 App. Cas. 108; Murphy v. Coffin & Co. [1883] 12 Q. B. D. 87; Thesis Sulphur Co. v. Morel, [1891] 2 Q. B. D. 647; Leonis Steamship Co. v. Rank, [1907] 1 K. B. D. 344.

that the steamer must arrive in the port ready to receive cargo by September 25, and, if not, then the charterer could cancel the charter at any time up to and including that day. Construing the several sections of the charter together, we think the 5 lay days began to run when the ship arrived in the harbor and the master reported himself ready to receive cargo.

[2] The charterer endeavors to sustain its contention that lay days should not begin to run until the vessel could get to her berth on the additional reason that section 4 of the charter party provides that:

"All and every unavoidable hindrances which may prevent the loading and delivery during the said voyage, always mutually excepted."

The defense is unavailable, for the reason that the rule of ejusdem generis applies; and the fact that the docks were so engaged by other ships ahead that the Lake Yelverton could not go immediately to her berth was not a hindrance of like nature with those before described. Mazza v. J. G. White Engineering Co. (D. C.) 274 Fed. 990; W. K. Niver Coal Co. v. Cheronea S. S. Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126; Maclachlan's Law of Merchant Shipping (5th Ed.) p. 584, and cases cited; Scrutton on Charter Parties and Bills of Lading (6th Ed.) p. 197, and cases cited.

[3] In its cross-appeal the United States insists demurrage should have been allowed for a full day, although the actual time over the lay days was only 14 hours and 20 minutes. The contract speaks in terms of days, using the words "day by day," making no mention of hours or fractions of a day. Commercial S. Co. v. Boulton, [1875] 10 K. B. 346, and Brackenlow S. Co. v. Lamport, [1897] 1 Q. B. D. 570, hold that a fraction of a day should be counted as a whole day in computing demurrage. The same rule is laid down in, Houlder v. Weir, [1905] 2 L. R. K. B. 267, in which Youmans v. Rex, [1904] 2 L. R. K. B. 429, is distinguished as decided on the special terms of the charter. Carver's Carriage by Sea (2d Ed.) 650, § 631; Scrutton on Charter Parties and Bills of Lading (6th Ed.) 278.

American authority on the subject is meager. The Olaf (D. C.) 248 Fed. 807, seems to accept the English view. In Mott v. Frost (D. C.) 47 Fed. 82, the court allowed only two days, when the delay had been for 2 days and a fraction. No reason is expressed for disregarding the portion of a day. Weir v. Northwestern Commercial Co. (D. C.) 134 Fed. 991, in which fractions of a day are counted, was decided on the peculiar conditions and customs at the port of Nome, Alaska. The consideration is not without weight that counting a substantial fraction of a day as a whole day may work hardship in computing high rates of demurrage on great modern ships. But such hardships may in all cases be avoided by expressing the contract for lay time in hours, instead of days, if it is intended to count fractions of a day. While the question is by no means free from difficulty, we think it safer to follow the trend of authority, and hold that the 14 hours and 20 minutes should be counted as a whole day, and demurrage allowed accordingly.

Modified.

ROSE, Circuit Judge (dissenting). If this were a case of first impressions, I should concur. It is not. Much of the conflict in the decisions has been due to commendable efforts of the courts to deduce the intentions of the parties from charter provisions not expressly directed to the point in dispute. Out of the litigation of more than a century, there have evolved some rules to which all or nearly all courts or text-writers now pay lip service at least. One of these is, where a particular wharf is named as the place of loading or discharge, the lay days will not begin to run until the ship is ready alongside that wharf. Carver's Carriage of Goods by Sea, § 628.

In the instant case the ship undertook to go to a customary wharf; that is, to one of the two piers controlled, not by the charterer, but by the railroad company. I doubt the practical wisdom of assuming that the cancellation clause proves that the parties agreed that the general rule should not bind them. If they had thought about it, and wished to free themselves from it, all they had to do was to use some such phraseology as that found in the charters discussed in W. K. Niver Coal Co. v. Cheronea Steamship Co., 142 Fed. 402, 73 C. C. A. 502, 5 L. R. A. (N. S.) 126.