## THE AQUARIUS.

### UNITED STATES v. DAVID T. BOYD & CO., Limited.

### No. 1674.

District Court, D. Maryland.
Nov. 11, 1930.

M. H. Avery, Admiralty Atty., U. S. Shipping Board, of Washington, D. C., and William C. Purnell, Asst. U. S. Atty., of Baltimore, Md.

Janney, Ober, Slingluff & Williams and Robert W. Williams and William A. Grimes, all of Baltimore, Md., for respondents.

SOPER, District Judge.

The libel in this case is brought by the United States as owner of the steamship Aquarius against David T. Boyd & Co., Limited, and others, and complains of the violation by the respondent of a charter party, under the terms of which the shipowner was to furnish the steamship Aquarius to carry certain pebble phosphate rock from Port Tampa, Fla., to Hamburg, Germany. It is admitted that the charter party was not carried out. Although the steamship was ready at the time provided in the charter to receive the cargo, no cargo was furnished, and this failure was one for which the shipowner was in no sense to blame.

The respondent excuses itself by reason of clause 2 of the terms and conditions of the charter party. That clause, as applicable to the facts of this case, may be paraphrased so as to read as follows: The charterer shall not be liable for any loss or damage resulting from unavoidable accidents to machinery or other unavoidable hindrances in mining the phosphate, restraints of established authorities, or any other causes or hindrances happening without the fault of the charterer.

The respondent having raised this point is, of course, charged with the burden of showing facts to bring the case within the exception. Fortunately, there is no dispute as to the facts; and for the purpose of the decision in this case they may be recited substantially as follows:

The charter party was dated December 1, 1925, and it was made between the agents of the United States Shipping Board Emergency Fleet Corporation and the respondent, David T. Boyd & Co., Limited. In place of the Boyd corporation there have appeared in this court representatives of J. H. Cottman & Co., which was associated with the Boyd Company in the exportation of pebble phosphate rock from the United States, and its sale abroad. The charter party provided for the carriage of 2,500 tons, afterward increased by subsequent amendment to some 3,300 tons of pebble phosphate rock in bulk, products of the mines in Florida of the Peninsular Phosphate Company. This rock was to be carried from Florida to Hamburg, Germany.

Two days after the execution of this charter party, a contract for the purchase of the necessary rock was entered into between J. H. Cottman & Co. and the Peninsular Phosphate Corporation, the owner of the mine in Florida, from which the cargo was to come. This mine had been shut down, according to the testimony, since December, 1924. Subsequent to that date, however, the machinery had been run for some minor operations, particularly for pumping of water from a portion of the mine, and during these minor operations it had been discovered that one of the cylinders in the Diesel engine, which formed part of the plant, was cracked. Some other minor defect developed, but it was so trivial as to be hardly worth while mentioning in this recital. The defect in the cylinder was the important thing. The evidence shows that the engine was of a standard type and a new cylinder could have been gotten and installed inside of thirty days, and that, after the plant had thus been put in shape, the necessary cargo could have been produced and shipped to the seaboard in seven days. So that it was physically possible within thirty-seven days from December 3, 1925, when the contract for the sale of the rock was signed, to have repaired the machinery, mined, and brought the rock to seaboard for shipment. No steps, however, to this end were taken by the people at the mine.

On December 15, 1925, there was an interview at the New York office of the Peninsular Company between the president of the

company and the manager or superintendent at the mine, in which the former told the latter of the contract, and indicated that it was to be carried out. There was, however, no attempt on the part of the Peninsular Company to carry out the terms of the contract; no steps were taken to repair the machinery, and no mining whatsoever was done; nor was there any notice given either to the Cottman Company, the purchaser of the material, or to the ship, that the cargo would not be forthcoming. There was still time on December 15, 1925, to repair the machinery and ship the cargo, because, under the terms of the charter party, the cargo was not to be ready until February 1, 1926. If, on December 15th, steps had been taken to repair the machinery and to mine the product, the necessary thirty-seven days would have brought the parties to January 21, 1926, and there would still have been some nine or ten days' leeway before the ship could have required the loading of the cargo. It is perfectly certain, therefore, that there was no unavoidable accident to the machinery or other unavoidable hindrances in the mining of the phosphate, taking those words in their usual sense. The testimony, indeed, does not furnish any reasonable explanation of the extraordinary conduct of the owners of the mine, unless it is found in the suggestion arising from a subsequent receivership that, at the time the contract of sale was signed and the cargo should have been shipped, the Peninsular Company was financially unable to do the work. It is clear, however, that financial inability would not amount to an unavoidable accident to machinery or hindrance in the mining of the rock.

It must be admitted by every one that the conduct of the Peninsular Company was a glaring exhibition of indifference on its part to the rights of others, especially the Cottman Company, and to the shipowner as well, for it is clear from the correspondence that the Peninsular Company knew that the rock was to be sent abroad by steamer. It is said, nevertheless, that Boyd & Co. and Cottman & Co. are excused from any liability under the exception clause above referred to. Cottman, on behalf of itself and Boyd, entered into the contract for the purchase of the rock without any particular investigation of the Peninsular Company, but there is nothing in the testimony to suggest that Cottman had any reason to believe that the Peninsular Company would not carry out its contract. Cottman seems to have been influenced by the fact that there had been dealings between it and the president of the Peninsular Company in prior times when the president was connected with another concern. Those dealings were satisfactory, and Cottman, no doubt, believed that similar satisfactory dealings would be had under the contract in this case.

It is further proved that Cottman had no knowledge that the Peninsular mine was shut down, or that the machinery was not in proper shape to permit the filling of the contract, or that the Peninsular Company was in such financial straits that it was unable or unwilling to carry out the contract. Hence it is said that the Cottman Company comes within the terms of the excepting clause, because as to it the accident to the machinery was unavoidable, and because also it comes literally within the words of the excepting clause, which relieves the charterer from loss and damage resulting from any cause or hindrances happening without the fault of the charterer.

The attention of the court has been called in this case to the fact that the parties intended in this form of charter party to confine themselves to the shipment of goods from a particular source, namely the mines of the Peninsular Phosphate Company in Florida, and that therefore the stricter rule which was discussed by Judge Rose in Hellenic Transport Steamship Company v. McNeil (D. C.) 273 F. 290, does not apply. At page 297 Judge Rose declared that it is settled that an excepting clause in a charter party will not relieve from liability merely because the cause of the delay or failure to ship prevented the party relying upon it from getting his cargo for the ship from the source at which he had planned to obtain it, unless that was, by the terms of the charter, or in the contemplation of the parties at the time it was made, or by the well-established course of trade, the only source from which he could have expected to get it. It is clear that the parties expected to get this cargo from the Peninsular mines, and therefore the charterer ought to be protected and excused from liability here if there was an unavoidable accident to the machinery at that mine, or if there was any other cause or hindrances happening without the fault of the charterer which prevented the mining of the goods, of such character as is contemplated by the excepting clause.

That brings us to the real question in the case, as to the proper interpretation of this clause. The respondent claims that the first part of the clause, namely, unavoidable accidents to machinery in the mining of phos-

phate, when read with the clause as a whole, covers any accident which is unavoidable from the standpoint of the charterer. Having this meaning in mind, the respondent says that this accident was unavoidable so far as the charterer was concerned, because the charterer had no control over the mine, and therefore that, even though the accident may have been avoidable by the mine owner, it is still true that it was unavoidable so far as the charterer is concerned.

It is the opinion of the court that this interpretation cannot be sustained. The language "unavoidable accident to machinery," literally considered, does not describe the accident in this case which was easily avoidable. It would have been a simple and easy matter to have put the machinery in shape to mine the rock, had the parties desired to do so. It seems to the court unreasonable to read into this clause such a qualification that the word "unavoidable" may be taken as meaning unavoidable so far as the charterer is concerned. While such a contract would doubtless have been to the advantage of the charterer, it would have been entirely against the interest of the shipowner; and it would require most convincing considerations to justify the conclusion that the shipowner intended to put itself at the mercy of the party at the mine so that there would be no redress, no matter how negligent that party might be. This position becomes the more reasonable when one takes into account the fact that under such a charter party as this there would, of course, be no right of action on the part of the shipowner, in any event, against the people at the mine, because there was no privity of contract between them. Therefore, the court concludes that the words "unavoidable accident to the machinery in mining" mean what they say and should not be qualified as the respondent contends.

Nor does the court believe that the remaining broader words in this excepting clause furnish a protection to the respondent in this case. These words are: "Any other causes or hindrances happening without the fault of the charterer preventing the mining of the cargo." These words follow immediately the words "restraints of established authorities." It is the opinion of the court that the words under discussion are to be considered as ejusdem generis with the preceding words "restraints of established authorities," and hence should take their color from these words and be construed in like manner. This is the rule which is laid down in the decision of Judge Woods in Lake Yelverton Case (C. C. A.) 300 F. 47.

It is unreasonable to suppose that the shipowner would have been willing to excuse the charterer from any causes whatsoever happening without his fault. When we consider the words "restraints of established authorities," we contemplate some outside intervening cause over which nobody in the course of dealing with the cargo has any control; and it is that sort of a cause which the parties must have contemplated in this case. This interpretation gains some support from the very wording of the preceding clause to which attention has been drawn, namely that which includes unavoidable accidents to machinery. If the parties contemplated that only unavoidable accidents to machinery should excuse the charterer, they would hardly have put in a clause so sweeping that any cause for which the charterer was in no way to blame would excuse him. If the clauses are given the interpretation which has been suggested, then the purpose of this particular kind of charter party will have been served; the charterer would be excused, not only from the general failure to furnish the cargo, such as that discussed by Judge Rose in the case referred to, but would be excused if it was impossible by reason of the particular causes enumerated to get the cargo from the particular source described in the charter party.

In short, it is the conclusion of the court that the United States has not only made out a prima facie case, but that the respondent has failed to show that it comes within the excepting clause; and consequently the prima facie case represents the final liability of the respondent on the facts before the court.